**JAMES REALTY COMPANY, Plaintiff,**

v.

**UNITED STATES of America,
Defendant.**

**No. 4–58–Civ.–430.**

United States District Court
D. Minnesota,
Fourth Division.

Sept. 1, 1959.

Joseph A. Maun, St. Paul, Minn., and Maurice L. Grossman, Minneapolis, Minn., for plaintiff.

Fallon Kelly, U. S. Atty., St. Paul, Minn., and Charles K. Rice, Asst. Atty. Gen., James P. Garland, Lyle M. Turner, Charles H. Magnuson, Dept. of Justice, Washington, D. C., for United States.

DEVITT, Chief Judge.

This is an action for recovery of $14,-066.11 plus interest, which is alleged by the taxpayer, James Realty Co., to be an overpayment of its income tax for its taxable year ending November 30, 1953. The taxpayer contests the action of the Commissioner of Internal Revenue in disallowing the taxpayer's $25,000 corporate surtax exemption [1] and its $25,000 minimum excess profits credit.[2] The Commissioner attempts to justify the disallowance under authority of section 129

---

1. Int.Rev.Code of 1939, § 15(b), as amended, ch. 521, § 121(f), 65 Stat. 468 (1951), 26 U.S.C.A. § 15(b).

2. Int.Rev.Code of 1939, § 431(2), added by Excess Profits Act of 1950, § 101, ch. 1199, 64 Stat. 1137, 26 U.S.C.A. Excess Profits Taxes, § 431(2).

308

(a) (1)³ and section 15(c)⁴ of the 1939 Internal Revenue Code. There are the further issues of determining the proper computations of the taxpayer's excess profits tax under section 430⁵ and of deciding whether the taxpayer was properly subjected to an accumulated earnings tax under section 102, 26 U.S.C.A. § 102.

The parties stipulated to submit the issues to the Court after a partial trial before a jury.

The controversy centers around the multiple incorporation methods used by Adolph Fine to conduct his home construction and real estate development businesses. The structure of this enterprise involves a construction company, Adolph Fine, Inc., a sales organization, Fine Realty, Inc., and a series of nine development companies whose main functions in the enterprise were to own land, to contract for construction of homes with Adolph Fine, Inc. and to sell the homes through Fine Realty, Inc. The controversy here is limited to the 1953 tax return of one of the development companies, James Realty Co., but the government's contention that the taxpayer was formed pursuant to a scheme of tax avoidance, necessarily involves a consideration of the other Fine corporations.

In 1944 Adolph Fine organized Adolph Fine, Inc. to engage in the construction business. Later, in 1949, he incorporated Fine Realty, Inc., one of whose principal activities was to sell homes built by Adolph Fine, Inc. Both of these corporations were controlled and managed by Adolph Fine and his wife Mildred Fine.

In 1952 Adolph Fine, as an individual, owned certain undeveloped land located in the village of St. Louis Park, Minnesota. After the land had been subdivided and platted for the purpose of home development, it was called the Jeffrey, James Fine Addition to St. Louis Park.

On November 20, 1952, Adolph Fine caused the James Realty Co. to be organized with an initial authorized capital of $25,000 consisting of 10 shares of Class A common stock at a par value of $100 (voting) and 240 shares of Class B common stock at a par value of $100 (non-voting). According to the articles of incorporation, the purpose of the corporation was, among other things:

"To acquire, improve, and develop real property; to erect dwellings of all kinds and to sell or rent the same; also to acquire, by purchase, lease or otherwise, and to take, own, hold, sell, exchange, transfer, lease, repair, maintain, improve, mortgage, or in any other manner deal in and with real property * * *."

On November 24, 1952 Adolph Fine transferred 18 lots in the Jeffrey, James Fine Addition to the James Realty Co. in exchange for two shares of Class A common stock and 34 shares of Class B common stock. The valuation placed upon the lots in terms of the 36 shares was $200 per lot or $3,600. On the same day, Adolph Fine transferred 17 shares of the Class B stock to Mildred Fine in trust for their sons Jeffrey and James.

On the same day, November 24, 1952, James Realty Co., acting through its president, Adolph Fine, entered into two written contracts. The first was an agreement with Adolph Fine, Inc. by which Adolph Fine, Inc. would construct houses on the lots owned by James Realty Co. at cost plus 12–½%. By the terms of a second contract with Fine Realty, Inc., Fine Realty, Inc. was made the exclusive selling agent of the homes to be constructed for James Realty Co. by Adolph Fine, Inc. The sales commissions were to be from 5 to 7–½% depending upon financing arrangements and costs.

3. Added by ch. 63, § 128(a), 58 Stat. 21 (1944), 26 U.S.C.A. § 129(a) (1).

4. Added by ch. 521, § 121(f), 65 Stat. 468 (1951), 28 U.S.C.A. § 15(c).

5. Added by Excess Profits Tax of 1950, § 101, ch. 1199, 64 Stat. 1137, 26 U.S.C.A. Excess Profits Taxes, § 430.

Under this arrangement, James Realty Co. proceeded to do business, and for its taxable year ending November 30, 1953, reported taxable income in the amount of $24,699.05. Summaries of its income statement and balance sheet have been taken from its tax return and are shown below:

### Statement of Profit and Loss

| | | |
|---|---|---|
| Sales (20 Houses and Lots) | | $228,520.50 |
| Less Job Cost | | 202,328.24 |
| Gross Profit | | $ 26,192.26 |
| Add: Other Income | $418.95 | |
| Less: Misc. Expense | 444.14 | -25.19 |
| | | $ 26,167.07 |
| Less Minnesota Income Tax Accrued | | 1,468.02 |
| Federal Taxable Net Income | | $ 24,699.05 |

### Balance Sheet

#### Assets

| | |
|---|---|
| Cash | $ 20,800.00 |
| Notes and Accounts Receivable | 12,907.43 |
| Organization Expense | 279.08 |
| Total Assets | $ 33,986.51 |

#### Liabilities

| | |
|---|---|
| Accounts Payable | $ 2,495.00 |
| Accrued Income Tax Payable | 8,877.74 |

#### Capital

| | |
|---|---|
| Capital Stock | $ 3,600.00 |
| Earned Surplus | 17,289.33 |
| Total Liabilities & Capital | $ 33,986.51 |

In August, 1953, 36 lots located in the neighboring West Tonka Hills Addition and owned by Fine Realty, Inc. were purchased by James Realty Co. from Fine Realty, Inc. at a price of $650 per lot, or a total price of $23,400. Of James Realty Company's total income for its year ending November 30, 1953, only $355.56 was attributable to the sale of lots received in this transaction.

James Realty Co. was one of nine development companies formed by Adolph Fine between 1950 and 1954. All of them occupied offices owned by Adolph Fine, Inc. and were supplied with bookkeeping services by the same personnel who kept the books of Adolph Fine, Inc. The reported incomes of these companies for the years 1950 to 1956, along with those of Fine Realty, Inc. and Adolph Fine, Inc. are contained in the schedule attached to this memorandum.

The District Director of Internal Revenue made a timely deficiency assessment against James Realty Co. for its taxable year ending November 30, 1953 by disallowing its corporate surtax exemption and excess profits credit and assessing

an accumulated earnings tax in addition. The taxpayer paid the claimed deficiency and now seeks a refund.

The basic contention of the government is that James Realty Co. was created solely for the purpose of tax avoidance and has therefore drawn itself within the penalties of Sections 129(a) (1) and 15(c) of the 1939 Internal Revenue Code. The taxpayer, on the other hand, attempts to show the bona fide business purpose justifying its own existence, and asserts that regardless of a tax avoidance purpose, the sections cited by the government are inapplicable to the present situation.

## I. Disallowance of Surtax Exemption and Minimum Excess Profits Credit, Section 129(a) (1).

Section 129(a) (1) of the Internal Revenue Code of 1939, entitled "Acquisitions made to evade or avoid income or excess profit tax," reads as follows:

"(a) Disallowance of deduction, credit, or allowance. If (1) any person or persons acquire, * * * directly or indirectly, control of a corporation, * * * and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income or excess profits tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then such deduction, credit, or other allowance shall not be allowed. * * *"

■ The taxpayer's first contention, that creation of a new corporation is not an acquisition of control of a corporation within the meaning of this section, must be rejected. Although the legislative history and the case law under Section 129 indicate that it was aimed at the abuses of one corporation acquiring going concerns which had accrued certain tax exemptions, see J. E. Dilworth Co. v. Henslee, D.C.Tenn.1951, 98 F.Supp. 957, 960 (dictum); Rudick, Acquisitions to Avoid Income or Excess Profits Tax: Section 129 of the Internal Revenue Code, 58 Harv.L.Rev. 196 (1944), there is no settled view that "acquisition of control" cannot and should not include the organization of a new corporation such as was done here. See Alcorn Wholesale Co., 1951, 16 T.C. 75, 88; 7 Mertens, Federal Taxation, § 38.66, n. 75 (1956). The regulations promulgated under the 1939 Code provide that acquisition of control of a corporation may be accomplished by acquiring the stock of a newly organized corporation. Reg. 118, §§ 39.-129–1(d) and 39.129–3(b) (2).

The more important issue under section 129 is whether this section can be used to deny the *acquired* corporation its normal surtax and excess profits credit or whether it is limited in its application to cases where the *acquiring* corporation or person is denied a particular credit, deduction, or allowance it has obtained from the acquired corporation. Grammatically, this issue is presented in the interpretation of the words describing the method of tax avoidance. These are "by securing the benefit of a deduction, credit, or other allowance which such [acquiring] person or corporation would not otherwise enjoy." If the antecedent of "which" is "deduction, credit, or other allowance," then section 129 should be limited to disallowing deductions of the acquiring person. However, if the antecedent of "which" is "benefit," then the section can logically be applied to the deductions of the acquired corporation also, since the acquiring person will be benefiting from them. See Barnard, Acquisitions for Tax Benefit, 34 Cal.L. Rev. 36, 99–100 (1945).

■ A line of Tax Court cases had established the former interpretation by enunciating the basic principle that section 129 applies only to deductions of the acquiring person and not to those of the acquired corporation. T. V. D. Co., 1957, 27 T.C. 879, 886; Chelsea Products, Inc., 1951, 16 T.C. 840, affirmed, 3 Cir., 1952, 197 F.2d 620; WAGE, Inc., 1952, 19 T.C. 249; Berland's Inc. of South Bend, 1951, 16 T.C. 182; Alprosa Watch Corp., 1948, 11 T.C. 240, (dictum); see A. B. & Container Corp., 1950, 14 T.C. 842. How-

ever, recent Courts of Appeal cases reflecting, I think, the better reasoning, have held that deductions of the acquired corporation may also properly be disallowed. Mill Ridge Coal Co. v. Patterson, 5 Cir., 1959, 264 F.2d 713;[6] Coastal Oil Storage Co. v. Commissioner, 4 Cir., 1957, 242 F.2d 396.

In the Coastal Oil Storage case, a parent corporation organized a subsidiary by transferring oil storage tanks to the subsidiary in exchange for its capital stock and a note. The business purpose motivating the transaction was allegedly to separate storage business under government contract from ordinary business. The Court found that the major purpose was tax avoidance and that section 129 (a) (1) could be employed to disallow the acquired subsidiary its normal surtax exemption and its minimum excess profits credit.

■ The acquisition of going concerns for the purpose of obtaining their particular tax benefits was the major evil sought to be corrected by the enactment of section 129(a). S.Rep.No.627, 78th Cong., 1st Sess. 27 (1944). But it was not the only one. This section was also aimed at correcting the abuse of splitting up a business enterprise for the purpose of obtaining extra surtax exemptions and excess profits credits. A 1951 Senate report on proposed amendments to the corporate surtax exemption provisions stated:

"It is not intended, however, that the exemption of the first $25,000 of a corporation's surtax net income from the surtax shall be abused by the splitting up, directly or indirectly, of a business enterprise into two or more corporations or the forming of two or more corporations to carry on an integrated business enterprise. It is believed that sections 45 and 129 will prevent this form of tax avoidance." S.Rep.No.2375, 81st Cong. 2d Sess. 70.

Coastal Oil Storage affirmed that this intent was applicable to section 129(a)

(1) as well as section 129(a) (2) long after the previously decided cases had made it doubtful.

■■ The corporate form cannot be used solely as an instrument of tax avoidance where there is no real business purpose motivating its use. Gregory v. Helvering, 1935, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596; Griffiths v. Commissioner, 1939, 308 U.S. 355, 60 S.Ct. 277, 84 L.Ed. 319; Higgins v. Smith, 1940, 308 U.S. 473, 60 S.Ct. 355, 84 L.Ed. 406. There was no real business purpose for the creation of James Realty Company.

Whether the land transferred came from Fine himself, or from one of his corporations, the tax avoidance purpose seems clear. The potential income of Adolph Fine, Inc. and Fine Realty, Inc. were siphoned off to James Realty Co. and the evidence shows that the income from ownership of the developmental property was arbitrarily fragmentized into corporate units conveniently accruing just under $25,000 per year. Adolph Fine thus obtained the benefit of an extra set of surtax exemptions and excess profits credits that he would not otherwise have enjoyed and to which he was not entitled.

Our view of the law finds additional support in similar situations arising under section 45 of the 1939 Internal Revenue Code, 26 U.S.C.A. § 45, which permits the Commissioner to distribute or apportion gross income, deductions, credits or allowances among several corporations or businesses owned by the same interests if the Commissioner determines that that is necessary to prevent evasion of taxes or to reflect the income of any of such corporations or businesses. Alpha Tank & Sheet Metal Mfg. Co. v. United States, Ct.Cl.1953, 116 F.Supp. 721; Advance Machinery Exchange, Inc. v. Commissioner, 2 Cir., 196 F.2d 1006, certiorari denied 1952, 344 U.S. 835, 73 S.Ct. 45, 97 L.Ed. 650.

In the Alpha case, supra, in commenting on the well-recognized principle that a taxpayer is privileged to minimize his

6. Appeal pending, see 20 Shepard's Fed.Rep. No. 2, p. 25 (August, 1959).

tax and is free to adopt such organization of his affairs as he may choose, the Court uses language appropriately descriptive of Adolph Fine:

"The application of this principle does not mean that a person may reduce his income tax by transferring his money from one pocket to another even though he uses a different pair of trousers. A man with a half-dozen pockets might almost escape liability altogether." 116 F.Supp. at page 723.

The taxpayer cites two recent tax court cases in support of its contention that section 129(a) (1) does not apply to the present case, British Motor Car Distributors, Ltd., 1958, 31 T.C. 437, app. authorized, par. 56,366 P-H Fed. Tax Current Dec. (April 2, 1959) and John P. Wagner, 17 CCH Tax Ct. Mem. 569, 949 (1958). In the British Motor Car case the stockholders of a home appliance corporation which had sustained heavy losses and was in the process of liquidating its business, was acquired by a profitable partnership engaged in the business of selling foreign automobiles. The assets of the partnership were transferred to the corporation, which changed its name, took up the foreign auto business and claimed a carry-forward of the losses sustained in the home appliance business. The Tax Court, with five judges dissenting, allowed the loss carry-over and held that section 129 was inapplicable by reaffirming its position that section 129 does not apply to deductions of the acquired corporation. This court disagrees with the position of the Tax Court and subscribes to the contrary views stated in Coastal Oil Storage Co. v. Commissioner, 4 Cir., 1957, 242 F.2d 396 and Mill Ridge Coal Co. v. Patterson, 5 Cir., 1959, 264 F.2d 713.

In John P. Wagner, the taxpayer, Transit Bus Sales Co., was a corporation organized in 1937 and controlled by Goemans and Wagner. Later four other corporations were organized by these individuals to engage in the business of teaching aeronautical skills and selling airplanes. When the aircraft corporations became partially defunct during the war, Transit Bus Sales Co. sold used buses to the four corporations, which in turn made profits by selling them to the public. The Tax Court found that the Commissioner had erred in attempting to impute the bus sale profits of the four corporations to the Transit Bus Sales Co. and held that section 129 was inapplicable, stating:

"As to section 129, that section is not applicable where the corporations were not formed, and did not acquire property for tax evasion or avoidance purposes. [citing case]. Our Findings clearly set forth the reasons for the formation of the corporations and the reason for the formation of the four corporations rather than one. *It should be noted also that some income was derived by each of the corporations directly from the particular activities for which the corporations were organized. These activities are far removed from those of Sales.*" [Emphasis added.] 17 CCH Tax Ct. Mem. at 614.

The present case is apparently distinguishable from the facts of Wagner in that James Realty Co. derived no income from independent activities of a nature different from those of Adolph Fine, Inc. and Fine Realty, Inc., but was organized solely as a repository for income siphoned off from the efforts of the other corporations.

The Court finds that the principal purpose for the acquisition of James Realty Co. by Adolph Fine was tax avoidance by securing the benefit of another corporate surtax exemption and excess profits credit which he would not otherwise have enjoyed. The surtax exemption and minimum excess profits credit of James Realty Co. were properly disallowed under section 129(a) (1).

In view of this finding, the issue as to whether the Commissioner's action is also justified under section 15(c) of the 1939 Code assumes only minor importance.

Without discussion, the Court finds his position proper.

## II. Computation of Excess Profits Tax, Section 430.

We next consider the propriety of the Commissioner's computation of the excess profits tax.

Under section 430, three different rates have possible application in computing the excess profits tax of the taxpayer for 1953:

I. Section 430(a) (1) sets a rate of 30% of adjusted excess profits net income. Adjusted excess profits net income is roughly the net income for the year less an excess profits credit which is an estimated proper amount of income based on either past earnings or invested capital. See §§ 431–436.

II. Section 430(a) (2) (C) allows an alternate rate of a flat 18% on excess profits income before the deduction of the excess profits credit.

III. Section 430(e) provides smaller graduated rates for new corporations during their first five taxable years.

■ The Commissioner has computed the excess profits tax under Section 430 (a) (1) at 30% allowing no credit against net excess profits income in reaching adjusted excess profits income. This, it appears, is erroneous. Section 430 clearly provides that the taxpayer is entitled to either the 30% rate against adjusted excess profits net income, or 18% of unadjusted excess profits income, whichever results in the lesser tax. The taxpayer is entitled, at least, to the 18% rate computation under section 430(a) (2) (C).

The question remains whether James Realty Co. has claim to a further reduced rate as a new corporation under Section 430(e). This section provides that instead of the 18% rate, rates graduated from 5% to 14% shall be applicable to corporations in their first to fifth taxable years. It is further provided in Section 430(e) (2) (B) that:

"The taxpayer shall be considered to have been in existence and to have had taxable years for any period during which it or any corporation described [below] was in existence, and the taxpayer shall be considered to have commenced business on the earliest date on which it or any such corporation commenced business:

\* \* \* \* \* \*

"(ii) Any corporation if a group of not more than four persons who control the taxpayer at any time during the taxable year also controlled such corporation at any time during the period beginning twelve months preceding their acquisition of control of the taxpayer and ending with the close of the taxable year; but only if at any time during such period \* \* \* such corporation was engaged in a trade or business substantially similar to the trade or business of the taxpayer during the taxable year."

The taxpayer admits that the other development companies, some of which were formed in 1950, were engaged in "substantially similar trades or businesses" as James Realty Co., but urges that Adolph Fine, Inc. and Fine Realty, Inc. were not so engaged. If only the former is true, then under the provisions of section 430(e), the taxpayer must be considered to be in its fourth taxable year and be accorded a rate of 11%, while if the latter is also true, then the taxpayer would be considered to be beyond its fifth taxable year and would be entitled only to the rate of 18%.

■ The taxpayer has not shown that prior to its formation, ownership and developmental activities substantially similar to its own were not being carried on by Adolph Fine, Inc. and Fine Realty, Inc. At the same time, the taxpayer, in its brief, recognizes that it has the burden of proving the applicability of the lower rates. On this state of evidence, the Court concludes that Adolph Fine, Inc. and Fine Realty, Inc. were conducting substantially similar trades or businesses as that of the taxpayer. Accordingly, the excess profits tax of James

Realty Co. should be computed at 18% under section 430(a) (2) (C).

## III. Surtax on Improperly Accumulated Surplus, Section 102.

Section 102 of the 1939 Internal Revenue Code provides that an additional tax shall be imposed on the net income of every corporation which is formed or availed of for the purpose of preventing the imposition of surtax upon its shareholders through the medium of permitting earnings or profits to accumulate instead of being divided or distributed.

The Commissioner assessed the taxpayer an additional tax under alleged authority of this section, the propriety of which is also put in issue by the pleadings.

The government's position in connection with this aspect of the case is not very lucid. Its position is stated, in its entirety, in its brief as follows:

"The sole purpose for creating the taxpayer corporation was to avoid the payment of corporate surtaxes and excess profits taxes. The taxpayer corporation did not require capital and was merely a business in form only. Mr. Fine could not recall any dividends having ever been distributed by the corporation through which he carried on the building and selling of houses."

In effect, as I see it, the government says that a corporation found not eligible for the surtax exemption and the minimum excess profits tax credit is, ipso facto, a fit subject for a section 102 surtax on improperly accumulated income. But the law doesn't say that, and no cases are cited by the government, nor found by the Court, in support of the theory.

The law, by its terms, is aimed at using a corporation for the purpose of preventing the imposition of surtaxes on shareholders through permitting profits or earnings to accumulate instead of being divided or distributed. It is also provided in section 102(c) that if it is shown that the earnings or profits of a corporation are permitted to accumulate beyond the reasonable needs of the business, that fact shall be determinative of a purpose to avoid surtaxes upon shareholders unless the taxpayer shall prove to the contrary by a clear preponderance of the evidence.

But here it has not been shown, and it is not apparent, that an accumulation of $17,000 by an infant corporation with current liabilities of $11,000 and with the imminent business responsibility for construction of 30 additional homes constitutes "permitting earnings or profits to accumulate" within the meaning of section 102(a) or that such is an accumulation "beyond the reasonable needs of the business" so as to evidence a purpose to avoid surtaxes on shareholders within the meaning of section 102(c).

As stated, the government introduced no evidence from which it could be concluded that the taxpayer unduly accumulated profits or earnings. It did not show that the reasonable needs of the business required less than the earnings accumulated, nor did it show the alleged increased tax that would be imposed upon the shareholders if the accumulated earnings or profits had been distributed. There was no evidence as to undue accumulation of earnings and profits by the other Fine corporations, and it is obvious that, in view of the interrelation of all of the Fine corporations, it would be impossible to determine whether this taxpayer unduly accumulated profits and earnings in violation of section 102 unless that was considered in conjunction with the accumulations of the other Fine corporations.

While an initial correctness must be assigned to the Commissioner's determination of the alleged section 102 liability, the taxpayer may rebut it. I think it did.

It is my view that the Commissioner was in error in assessing section 102 liability on the taxpayer.

Defendant will please prepare appropriate Findings in concert with plaintiff.

(Abbreviated Schedule Reflecting Defendant's Exhibit B)

Income from Sale of Homes

| Name | Date of Incorporation | Income Per Tax Return | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | 1950 | 1951 | 1952 | 1953 | 1954 | 1955 | 1956 | |
| Adolph Fine, Inc. | 3–6–44 | 202,268 | 24,864 | 25,889 | 45,084 | 13,804 | 21,062 | (−26,097) loss | |
| Fine Realty, Inc. | 11–2–49 | 34,212 | 18,309 | 23,314 | 22,466 | (8,256) loss | 10,369 | (− 5,766) loss | Merged into parent company at 6–30–55 |
| Westport Row, Inc. | 8–22–50 | | 24,837 | 21,972 | 17,933 | 13,983 | 4,115 3,448 | | |
| Edina Homes, Inc. | 7–18–50 | | None | 22,520 | 23,948 | 16,500 | 10,621 | | Merged into Morning Park, Inc. at 7–31–55 |
| Texa-Tonka, Inc. | 3–23–50 | | 23,077 | 21,261 | 22,457 | 9,248* | | | Merged into Texa-Tonka Shopping Center, Inc. at 9–1–54 |
| Morning Park, Inc. | 11–8–50 | | None | 19,488 | 24,068 | 14,571 | 8,538 | 5,365 | |
| Texas Investment Co. | 8–1–52 | | | 24,472 | 24,851 | 9,032 | 22,391 | 17,691 | Merged into Diversified Development Co. at 11–30–56 |
| Northwestern Development Co. | 10–7–52 | | | | 21,817 | 20,082 | 24,253 | 23,015 | |
| James Realty Co. | 11–24–52 | | | | 24,699 | 14,524 | 11,794 | 4,674 | |
| Jeffrey Realty Co. | 11–24–52 | | | | 18,822 | 22,232 | 8,070 | | Merged into James Realty Co. on 9–30–55 |
| Universal Development Co. | 12–2–53 | | | | | 11,448 | | | |
| Trust Properties Co. (Partnership for Fine children) | Organized 6–1–54 | | | | | | 24,122 | 6,986 | |

Gross profits on sale of houses

* (includes $5446.00 of rental income)