HABERMAN FARMS, INC., a corporation, Plaintiff,

v.

UNITED STATES of America, Defendant.

George HABERMAN and Fannie Haberman, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Rex S. HABERMAN and Phyllis Haberman, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. Nos. 215L, 216L, 217L.

United States District Court
D. Nebraska.

March 30, 1960.

Flavel A. Wright, Frank D. Williams, Lincoln, Neb., for plaintiffs.

Paul K. Kirkpatrick, Jr., Atty., Tax Division, U. S. Dept. of Justice, Washington, D. C., for defendant.

VAN PELT, District Judge.

These three actions were consolidated and tried to the Court without a jury. Haberman Farms, Inc. is a corporation in which all of the stock is owned by

Hubert Haberman and his wife. George Haberman is the father of Rex and Hubert Haberman. George Haberman, Rex Haberman, and their wives, and Haberman Farms, Inc. are the plaintiffs in these consolidated actions, and will hereinafter be referred to as "taxpayers."

## Findings of Fact

Taxpayers brought these actions to recover taxes collected by the Commissioner of Internal Revenue. These taxes were assessed on the net income earned by Haberman Industries, Inc. during the years 1952, 1953, and 1954. The Commissioner allocated to taxpayers the entire net income derived by Haberman Industries, Inc., which income came wholly from farms and property deeded or leased by taxpayers to Haberman Industries, Inc. on March 1, 1952 for a term of five years. It is the contention of the defendant United States that Haberman Industries, Inc. acted as a mere sham and was utilized by the taxpayers for the sole purpose of tax avoidance during the years of question. It is the contention of the taxpayers that Haberman Industries, Inc. served a legitimate business purpose, was not a sham, and was utilized for more than mere tax avoidance.

Haberman Industries, Inc. (hereinafter referred to for convenience as "the corporation") was duly organized under the laws of the State of Nebraska with its articles of incorporation having been filed in June of 1950. The corporation is still in existence and is and has continually been in good standing in the office of the Secretary of State of the State of Nebraska. The stock of the corporation has at all times been held in equal shares by George Haberman, Rex Haberman, and Hubert Haberman.

In 1950 and 1951, the corporation engaged in the manufacture of a machine called a "fogger." This fogger was a device for spraying insecticides. The corporation conducted extensive operations with reference to the fogger for more than a year after its organization. A number of machines were sold throughout the country. This business operation, however, became a failure as a result of a malfunction of the machine which caused it to catch fire on use.

Rex Haberman, president of the corporation, spent approximately six months in Chicago around the middle of the year 1951 working on the corporation's affairs with regard to the fogger, after which the fogging operations were essentially discontinued. Rex Haberman then returned to Nebraska sometime around August or September of 1951. Soon thereafter, the taxpayers along with a lawyer and an accountant began holding discussions with a view toward deciding what to do about the corporation. At this time, the corporation had a deficit of $74,818.73 approximately all of which was owing to the taxpayers who had invested $80,200 in the corporation up to that time.

The taxpayers owned certain farms which up until 1952, they rented on shares, except for some custom farming by George Haberman or the Farmers' National Company, a farm management organization. Haberman Farms, Inc. owned a cold storage building. It was decided in the discussions of the taxpayers and their advisors that the taxpayers would lease, sell, or convey certain properties to the corporation. In carrying out this decision, leases on certain of these farms were executed by the taxpayers to the corporation. Certain grains, growing crops and seeds were sold to the corporation. A deed to the cold storage building belonging to Haberman Farms, Inc. was properly executed and delivered to the attorney and director for the corporation. This deed was never recorded. In March and April, 1952, bank accounts were opened in the City National Bank of Hastings, Nebraska, in the name of the corporation, and designated, "Haberman Industries Farm No. 1," "Haberman Industries Farm No. 2," and "Haberman Industries Farm No. 3." All the receipts from the property described in the leases, bills of sale, and deed were deposited in these accounts during the years here involved. The

proceeds from George Haberman's farms were deposited in Haberman Industries Farm No. 1, the proceeds from farms owned by Haberman Farms, Inc., and the rent from the cold-storage building were deposited in Haberman Industries Farm No. 2, and the proceeds from Rex Haberman's farms were deposited in Haberman Industries Farm No. 3. At the time of the transfers of the property, the income and profits involved herein had not yet come into existence. The books and records of the corporation were kept separately from the books or records of the taxpayers.

The leases on the farms were, as mentioned, for a period of five years. The rental to be paid by the corporation to the taxpayers was in the amount of $3.50 per acre, except for a portion of the farm lands leased by George Haberman which rental was at a rate of $4.50 per acre, the extra compensation in consideration for machinery and equipment leased on that portion. The rentals received from the farms and the cold-storage building were deposited in the Haberman Industries Farm accounts according to the properties from which they were derived, and the taxpayers could draw from the account wherein the moneys from their leased or conveyed property were deposited. In the case of Haberman Industries Farm Account No. 2, wherein moneys from Haberman Farms, Inc. (owned by Hubert Haberman and his wife) were deposited, both Hubert Haberman and his wife could make withdrawals. Withdrawals by the taxpayers were not necessarily limited to rentals. In the case of withdrawals in excess of rentals, this would be evidenced in the books of the corporation as a debit to the taxpayer's account, which account included both rentals accrued and the amount the corporation was indebted to that taxpayer. Withdrawals were not made by any of the taxpayers to pay for personal items.

The corporation had no employees, paid no salaries (however certain amounts paid to custom farmers were shown on the tax returns as wages), did no farming or farm management, and did not engage in any activity or assume any functions different from that which existed prior to its acquiring leases on the land, other than to collect the rentals from the properties. Taxpayers continued to manage the property to the extent they had previously. The Farmers National Company continued to custom farm certain of the lands, making its checks payable to Haberman Industries Farm Accounts Nos. 2 and 3 rather than to the taxpayers.

In 1953, George Haberman sold some of the farm land he had leased to the corporation. After the sale he collected rent for a time, evidently on the wheat that was growing on the land at the time of sale. The sale was made at an auction. The decision to go ahead and sell the land was made after consultation among all of the taxpayers. No release was obtained from the corporation, nor was any consideration paid to it. An interest in the growing wheat was reserved by seller and the rent collected by him.

On its tax returns for its fiscal years 1952 through 1954, the corporation reported the rentals from the farms and the cold storage building as its own income and deducted the rentals to the taxpayers as expense. The taxpayers reported as income the rental from the corporation and claimed deductions for taxes, interest and depreciation on farm buildings and machinery. The Commissioner of Internal Revenue attributed the income reported by the corporation on its tax return to the taxpayers and assessed deficiencies against the taxpayers with respect to that income. The taxpayers paid the deficiency and filed with the Commissioner claims for refund. The claims were disallowed. This action was then filed.

### Conclusions of Law

Jurisdiction of this Court is founded upon 28 U.S.C. § 1346(a)(1).

The government has urged as justification for its action Section 45 of the

1939 Internal Revenue Code, 26 U.S.C. § 45, which reads:

"In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Commissioner is authorized to distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses."

However, the government has not pressed any argument concerning this Section in its brief submitted after trial.

In its brief, the government has urged the proposition that the Commissioner may ignore a corporate entity which has no business purpose and exists only for tax avoidance. This proposition was stated in Higgins v. Smith, 1940, 308 U.S. 473, 477, 60 S.Ct. 355, 358, 84 L.Ed. 406 as follows:

"A taxpayer is free to adopt such organization for his affairs as he may choose and having elected to do some business as a corporation, he must accept the tax disadvantages.

"On the other hand, the Government may not be required to acquiesce in the taxpayer's election of that form for doing business which is most advantageous to him. The Government may look at actualities and upon determination that the form employed for doing business or carrying out the challenged tax event is unreal or a sham may sustain or disregard the effect of the fiction as best serves the purposes of the tax statute. To hold otherwise would permit the schemes of taxpayers to supersede legislation in the determination of the time and manner of taxation. It is command of income and its benefits which marks the real owner of property."

Taxpayers, in answer, assert that there were substantial business purposes underlying the transactions, that these purposes were the desire to get the corporation on its feet, the desire to insure a fixed income for all the taxpayers by way of fixed cash rentals rather than the risk of share rentals, the desire to arrange for joint management of the property through the corporation, and the desire to salvage the tax loss which had been suffered by the corporation. Upon this issue—existence of a business purpose,—the controversy herein will turn.

This Court has carefully considered the cases cited by the parties along with others. An analysis of the facts and holdings of these cases leaves no common, precise touchstone for this Court to apply to this principal issue here. Compare Gregory v. Helvering, 1935, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596; Higgins v. Smith, supra; James Realty Co. v. United States, D.C.D.Minn.1959, 176 F.Supp. 306 and British Motor Car Distributors, Ltd., 1958, 31 T.C. 437, reversed 9 Cir., 278 F.2d 392; The T. V. D. Co. v. Commissioner, 1957, 27 T.C. 879. However, certain common principles do emerge which, when applied to the matter herein, are sufficient for a determination.

One may choose any form of lawful organization to conduct a business, even if the choice is based solely on motives of tax reduction. But this mere form, as such, does not create a taxable entity. The Commissioner may ignore the form of business as an entity for tax purposes unless there be substance to that form. Neither tax advantages nor legal formalities conceive substance, for substance is born from activity or purpose, and from these only, although it is to be noted that substance may arise solely from form if the form as such has purpose other than the increment of tax benefits. See Gregory v. Helvering, supra; Kraft Foods Co. v.

Commissioner, 2 Cir., 1956, 232 F.2d 118; Alpha Tank & Sheet Metal Mfg. Co. v. United States, Ct.Cl.1953, 116 F. Supp. 721. Formalities cannot alone require the Commissioner to recognize for tax purposes the transfer by a taxpayer of income-producing properties "from one pocket to another even though he uses a different pair of trousers." Alpha Tank & Sheet Metal Mfg. Co. v. United States, supra, 116 F.Supp. at page 723. "The corporate form cannot be used solely as an instrument of tax avoidance where there is no real business purpose motivating its use." James Realty Co. v. United States, supra, 176 F.Supp. at page 311.

■ Was then the corporation here used as a lessee solely for tax avoidance by the taxpayers—did it serve any authentic business purpose in assuming the leases? Taxpayers have asserted a number of legitimate business purposes as justifications for the transfers of property. The evidence does not bear out these assertions.

Taxpayers testified that they sought to insure a fixed income. The Court does not feel justified in finding that an insolvent corporation could give such assurance. True, it may have been possible, as taxpayers hypothesize, that one of the taxpayers might have had all of the crops on his farms destroyed while the others did not, and still receive an income consisting of the rentals from the corporation. This achievement of a guaranteed income in such a situation was a possibility, but its reality is not indicated from the evidence. The segregation of the income of the corporation into accounts dependent upon the source of the income compels this Court to a conclusion that under the situation hypothesized, there would have been no income to the taxpayer on whose land the crops had been lost for the account from which he might have drawn would have been barren. Again, if there had been a good crop year which might have provided the corporation with a reserve for a possible bad crop year, the evidence indicates that this reserve could have

been withdrawn as payment on the corporation's indebtedness to taxpayers, regardless of whether the corporation formally acted or not to pay part of this indebtedness with the reserve. This Court cannot deny the possibility that the transactions involved might have provided taxpayers with a means for a guaranteed income, but this Court concludes from all of the evidence that the transactions were neither intended for nor served this purpose.

Taxpayers' assertions that they sought to arrange for joint management of the property through the corporation is again an assertion of a mere possibility, and its reality is not indicated by the evidence. The methods and means of management were not changed by the transactions. All that is of substance to this assertion is the assertion itself, and this has come too late.

This Court concludes that there existed no authentic business purpose in the corporation's assuming the leases of farm land and the conveyances of certain other properties. Especially persuasive to this conclusion is the evidence of the disregard of the transactions by all the taxpayers when George Haberman sold some of the farm land under lease. This disregard for the transactions, and the segregation of funds on a basis of source —even the rentals paid to the corporation for the cold storage house which has been sold to the corporation were not deposited in all three accounts but were deposited in the account from which Hubert Haberman and his wife, the conveyers, might draw—leads this Court to conclude that the sole purpose of the corporation as formal lessee or owner of the properties was to act as a device for tax avoidance for the incomes of these properties. The Commissioner of Internal Revenue was acting properly when he ignored Haberman Industries, Inc., as a tax entity for the incomes of these properties and allocated the net income to the taxpayers. Taxpayers' reliance upon The T. V. D. Co. v. Commissioner, supra, is misplaced. In that case, the corporation had an authentic business

834

purpose—the payment of a debt to the Bank of America. Here there is a debt, but the lessors of the income-producing property from the income of which the debt might be paid were the creditors themselves. In The T. V. D. Co. case, we have an at arms length purchase of a corporation by the company with the loss carry-over and no intercompany transactions.

In the opinion in The T. V. D. case it is commented that it was anybody's guess as to whether the business would continue profitable after the takeover. Whether the leases here would be profitable or not did not depend in any degree upon Haberman Industries, Inc. It was merely a channel through which to receive rentals on which no tax would be paid due to the loss carry-over, for some time, and pay them to lessors who were also the creditors.

Counsel for the defendant United States of America will prepare appropriate orders in each case, submitting them first to counsel for the plaintiffs for approval as to form only. When signed by this Court, such orders will constitute the appealable orders in these cases. This memorandum is not to be regarded as an appealable order.