OPINION. TURNER, Judge: In imposing the surtax on the taxable income of a corporation, section 11(c) of the Internal Revenue Code of 1954 provides an exemption of $25,000. In section 269(a),[1] it is provided that if a person acquires control of a corporation and the principal purpose of such acquisition is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which, such person or corporation would not otherwise enjoy, then the deduction, credit, or allowance shall not be allowed. For the purposes of section 269(a) (1), it is provided that “control means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote * * The respondent in his determination of deficiencies has determined that Ooncord was organized for the purpose proscribed in section 269(a) (1) and that it is not, therefore, entitled to the $25,000 exemption provided in section 11(c) for corporate surtax purposes. It is not disputed that both Elkhart and Concord were organized by Percival J. Haines or that Haines acquired at the time of organization and has since owned and held more than 50 percent of the voting stock of both Elkhart and Concord. The facts show that Haines was advised, possibly in the early part of 1953, that U.S. Rubber was interested in a “150,000 square foot” warehouse in or near the city of Elkhart to replace its then footwear warehouse located in another area and was requested to prepare and submit a proposal for the construction and leasing of such a warehouse. Before his proposal was presented he was further advised that U.S. Rubber wanted an additional warehouse of 100,000 square feet to be used for automobile mats and foam rubber. On or about April 6, 1953, Plaines submitted a proposal to U.S. Rubber that “we” propose to form a corporation or corporations for the purpose of erecting two buildings, with both buildings to be provided with sprinkler systems for fire prevention and equipped with adequate sewer, water, heating, and lighting facilities, the lights to be fluorescent. The larger building was to be ready for occupancy on October 1,1953, and the smaller one to be available July 1,1954. U.S. Rubber notified Haines on April 15, 1953, that his proposal had been accepted. Haines thereafter obtained a commitment from Elkhart New Industries Trust Fund, an adjunct to the Elkhart Chamber of Commerce, for the land required for the project, and on June 22, 1953, Elkhart Industries formally approved the beginning of construction of “building Number 1 for warehouse use by the U.S. Rubber Company” on the land provided. Building No. 1 was constructed under the ownership of Elkhart Warehouse Corporation, incorporated August 4,1953, with Haines acquiring 54 of the 100 shares of the stock issued. In the early discussions U.S. Rubber had given consideration to the construction of two detached warehouse buildings with the railroad spur running between them, but concluded that its purpose was better served by having the structures separated only by a common wall. In his planning of the construction, Haines made arrangement with the building material suppliers for the materials and supplies necessary for tlie construction of both buildings at prices common to both. He also obtained a commitment from Lincoln National for permanent financing of the completed project, which made it possible to obtain the required construction money from a bank or banks. This commitment was based on the agreement of TJ.S'. Rubber to lease the two buildings when completed. In the Elkhart lease, which was executed on November 17, 1953, it was recited that TJ.S. Rubber desired “to lease building space * * * to be used for warehouse and office purposes.” In the Concord lease, which was executed on January 4,1955, it was recited that TJ.S. Rubber desired to lease space “to be used for warehouse purposes.” In each lease, it was provided that the building covered be equipped with wiring, piping, plumbing and heating equipment, and a sprinkler system. In the Elkhart lease it was specified that Elkhart shoidd provide a reliable secondary water supply for sprinklers and hydrants, by means of a 150,000-gallon aboveground reservoir or storage tank, and a manually and automatically controlled, electrically driven centrifugal fire pump, to be housed in a detached noncombustible pumphouse, the pump to have a capacity of 1,000 gallons per minute, at a 100-pound pressure. In the Concord lease it was specified that its sprinkler system should be connected by an 8-inch pipe to the storage tank provided for in the Elkhart lease. It was further provided that this secondary water supply from Elkhart should be always available to TJ.S. Rubber as long as its lease, as extended or renewed, should continue in force. When completed the building belonging to Elkhart was a complete operable warehouse facility. Built into the unit was the space for the office necessary to the management and operation of the warehouse, a heating plant, and toilet facilities. Opposite the southeast comer of the building was a reservoir for the purpose of supplying water necessary to the operation, including the sprinkler system for fire prevention. The outer walls were built of hollow concrete blocks except that the blocks composing the west wall were filled with cement so as to constitute a firewall. It was at that wall building No. 2, when constructed by Concord, was to be attached and become a part of the integrated warehouse facility. The Elkhart building, including the west wall, was entirely on land belonging to Elkhart. The Elkhart building was completed for substantial occupancy and the lease to TJ.S. Rubber became effective May 15,1954. As constructed the Concord building was attached to the Elkhart building so as to utilize Elkhart’s west wall as its east wall. Only the north, south, and west walls were on Concord’s property. Concord had no office space or facilities, and no heating plant or toilet facilities. It received its water through Elkhart and it was dependent upon Elkhart’s reservoir for its secondary water supply. Its electrical wiring came through, the Elkhart building and there was no separate meter to measure the current used as between the Elkhart space and the Concord space. It would thus appear that separately and independently of Elkhart, Concord did not have an operable warehouse facility and there is no evidence which indicates any intention that it should. Haines himself acknowledged that such was the case in his testimony that if Concord should have a renter other than that of Elkhart “we will have to put in a new boiler and toilets, revamp the wiring, and probably build an office building.” It follows, we think, that at the most the Concord structure was an appendage to the Elkhart warehouse and aside from the added truck dock and the railroad siding merely supplied additional storage space. Not only was there only one arrangement with the suppliers for materials and supplies for both the Elkhart and Concord buildings, but in their construction there was no segregation of actual cost as between the two. To the contrary, the total cost was divided between the two buildings by allocation according to the square footage of the total warehouse space. The major portion of the materials and supplies going into the construction of Concord’s structure, although delivered on the Concord site, was charged to Elkhart and was paid for by Elkhart. Elkhart also repaid the bank for some $40,000 of the construction money which had been received for the purpose of constructing the Concord building. In all, Elkhart actually supplied $167,980.42 of the $215,716.63 arrived at through the above allocation as the cost of the Concord building and carried on its books as such cost. The $167,980.42 representing the payments so made by Elkhart was duly entered on the books of account set up for Elkhart and Concord and was reflected on Elkhart’s books as a receivable and on Concord’s books as an account payable. At the time of the trial the indebtedness so shown against Concord had been reduced by $5,000. Under the commitment which Haines had with Lincoln National, Elkhart executed a mortgage to Lincoln National on July 21, 1954, to cover the permanent financing of its property. Concord executed its mortgage to Lincoln National on March 7,1956. In each instance the U.S. Eubber lease covering the property so mortgaged was assigned to Lincoln National as further security for the mortgage. There was one difference. Elkhart joined in the Concord mortgage to Lincoln National as mortgagor and subject to the mortgage liability already covered in its prior mortgage also mortgaged its property to Lincoln National as security for the payment of Concord’s mortgage liability. It was the testimony of Haines that at the time of incorporating Concord he was aware that Concord would under the statute have a surtax exemption separate and apart from that of Elkhart, although it was his further testimony that even if there had been no tax advantage, he would have organized the additional corporation in any event. The respondent has determined that the motivation for the creation of Concord and for making it the owner of a portion of the completed warehouse facility was to avoid Federal income tax by securing the benefit of a second $25,000 surtax exemption. The burden of showing facts which will justify a conclusion to the contrary is on the petitioner. The reasons advanced to show that the second surtax exemption was not the principal purpose for the organization of Concord appear to be (1) to protect one warehouse building against loss of the other if some unforeseen event should occur and (2) a desire to arrange the ownership so as to fairly and properly divide ownership interests between his children. As nearly as we are able to determine, the unforeseen event which was feared was the loss of a satisfactory tenant for one or both portions of the warehouse facility, which, on the record here, must be said to have been more imagined than real. U.S. Rubber was a solid tenant for both buildings for an indefinite time in the future, having committed itself before construction was started and Lincoln National in providing mortgage money closely comparable to the total cost of construction rather obviously regarded its leases very highly. As for the division of the ownership interests between the Haines’ five sons there is no showing as to just how the two corporations served the purpose better than one, particularly when it is noted that the interests of the two youngest sons were restricted to Concord which was not in and of itself an operable warehouse facility. As shown of record, the one purpose of apparent substance if accomplished would have been the second surtax exemption of which Haines testified he was aware. Elkhart and Concord in practical respects separately exist and operate only on paper, which in our opinion is not sufficient in the circumstances here to render section 269(a) (1) inapplicable. James Realty Company v. United States, 280 F. 2d 894, affirming 176 F. Supp. 306, is in material respects similar to this case. See also Commissioner v. British Motor Car Distributors, Ltd., 278 F. 2d 392, reversing 31 T.C. 437; Mill Ridge Coal Co. v. Patterson, 264 F. 2d 713; Coastal Oil Storage Co. v. Commissioner, 242 F. 2d 396; and Thomas E. Snyder Sons Co. v. Commissioner, 288 F. 2d 36, affirming 34 T.C. 400, which agreed with the reversal of British Motor Car Distributors, 31 T.C. 437. In view of the conclusions reached, it is not necessary to consider the respondent’s contention that petitioner is not entitled to the surtax exemption under section 1551 of the Code. Decision will be entered under Rule 50, SEC. 269. ACQUISITIONS MADE TO EVADE OR AVOID INCOME TAX. (a) In Geneeai.. — If— (1) any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation * * * ******* and the principal purpose for which such acquisition was made Is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then such deduction, credit, or other allowance shall not be allowed. For purposes of paragraphs (1) and (2), control means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock of the corporation.