JAMES REALTY COMPANY, a Corporation, Appellant,

v.

UNITED STATES of America, Appellee.

No. 16406.

United States Court of Appeals Eighth Circuit.

July 21, 1960.

Joseph A. Maun, St. Paul, Minn. (Maurice L. Grossman, Minneapolis, Minn., on the brief), for appellant.

George F. Lynch, Atty., Dept. of Justice, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Harry Marselli and Lee A. Jackson, Attys., Dept. of Justice,

Washington, D. C., and Fallon Kelly, U. S. Atty., St. Paul, Minn., on the brief), for appellee.

Before GARDNER, WOODROUGH, and BLACKMUN, Circuit Judges.

WOODROUGH, Circuit Judge.

The taxpayer James Realty Company, a corporation, prosecutes this appeal from that part of a judgment which denies it recovery of refund of its payment of deficiency assessed for corporate surtax and excess profits tax for its taxable year ending November 30, 1953. It received and made return of income of $24,699.05 for the period and claimed deduction under the $25,000 corporate surtax exemption and $25,000 minimum excess profits tax credit allowed by Section 15(b) [1] and Section 431,[2] Internal Revenue Code of 1939.

The Commissioner disallowed the deduction and credit on the ground that the corporation was created solely for the purpose of tax avoidance and was deprived of the right to the exemption and credit by Sections 129(a) [3] and 15(c) [4] of the Internal Revenue Code of 1939. The resulting deficiency was paid and this action followed. After partial trial before a jury, the issues were submitted to the Court by stipulation of the parties. The opinion of the Court is published at 176 F.Supp. 306.

It appeared on the trial that Adolph Fine organized Adolph Fine, Inc. in 1944 to engage in the construction business and later in 1949 he incorporated Fine Realty, Inc., whose principal activity was to sell homes built by Adolph Fine, Inc. Both of these corporations were controlled and managed by Adolph Fine and his wife, Mildred, who owned the stock of such corporations individually or in trust for their children. Also, at all times pertinent hereto, Adolph Fine was president and treasurer, Mildred Fine was vice president and secretary, and

1. Int.Rev.Code of 1939, § 15(b), as amended, ch. 521, § 121(f), 65 Stat. 468 (1951), 26 U.S.C.A. § 15(b).

2. Int.Rev.Code of 1939, § 431(2), added by Excess Profits Act of 1950, § 101, ch. 1199, 64 Stat. 1137, 26 U.S.C.A. Excess Profits Taxes, § 431.

3. Added by ch. 63, § 128(a), 58 Stat. 21 (1944), 26 U.S.C.A. § 129(a).

4. Added by ch. 521, § 121(f), 65 Stat. 468 (1951), 26 U.S.C.A. § 15(c).

June Myslajek was assistant secretary to Adolph Fine, Inc.; Mildred Fine was president and treasurer, M. L. Grossman was vice president, and June Myslajek was secretary of Fine Realty, Inc.

In 1952, Adolph Fine, as an individual, owned certain undeveloped land located in the village of St. Louis Park, Minnesota, which he caused to be subdivided and platted for the purpose of home development, and named it the Jeffrey, James Fine Addition to St. Louis Park.

On November 20, 1952, Adolph Fine caused the taxpayer, James Realty Company, to be organized with an initial authorized capital of $25,000, consisting of ten shares of Class A common stock at a par value of $100 (voting) and two hundred and forty shares of Class B common stock at a par value of $100 (non-voting). According to the articles of incorporation, the purpose of the corporation was, among other things:

> "To acquire, improve, and develop real property; to erect dwellings of all kinds and to sell, or rent the same; also to acquire, by purchase, lease, or otherwise, and to take, own, hold, sell, exchange, transfer, lease, repair, maintain, improve, mortgage, or in any other manner deal in and with real property * * *."

On November 24, 1952, Adolph Fine conveyed eighteen of the lots in the Jeffrey, James Fine Addition to the taxpayer corporation in exchange for two shares of its Class A common stock and thirty-four shares of its Class B common stock. The value of the lots in terms of the thirty-six shares was $200 per lot or $3,600. On the same day, Adolph Fine transferred seventeen shares of the Class B stock to his wife Mildred in trust for their sons Jeffrey and James.

Also on November 24, 1952, the taxpayer corporation, acting through its president, Adolph Fine, entered into two written contracts. The first was an agreement with Adolph Fine, Inc., by which that corporation would construct

houses on the lots owned by the taxpayer James Realty Co., at cost plus 12½%. By the terms of a second contract, with Fine Realty, Inc., that corporation was made the exclusive selling agent of the homes to be constructed for taxpayer by Adolph Fine, Inc. Sales commissions were to be from 5% to 7½% depending upon financing arrangements and costs.

In August, 1953, taxpayer purchased thirty-six lots located in the neighboring West Tonka Hills Addition from Fine Realty, Inc. at a price of $650 per lot, or a total price of $23,000.

During its fiscal year ended November 30, 1953, when taxpayer reported taxable income in the amount of $24,699.05, only $355.56 of this amount was attributable to the sale of lots purchased from Fine Realty, Inc., while the remaining income was derived from sales of houses built on lots acquired from Adolph Fine.

Taxpayer was one of nine development companies formed by Adolph Fine between 1950 and 1954. All of them occupied offices owned by Adolph Fine, Inc., and were supplied with bookkeeping services by the same personnel who kept the books of Adolph Fine, Inc.

Taxpayer filed a timely income tax return for the fiscal year ended November 30, 1953, and paid the tax shown thereon in the amount of $7,409.72. The District Director of Internal Revenue for the District of Minnesota made a deficiency assessment in the amount of $14,066.11, plus statutory interest, by disallowing the corporate surtax exemption and excess profits credit, and assessing an accumulated earnings tax under § 102, Int.Rev.Code of 1939, 26 U.S.C.A. § 102, in addition.[5] Taxpayer paid the deficiency assessed, plus interest in the amount of $3,480.80, and thereafter filed the timely claim for refund which the Commissioner denied.

The Court considered the testimony tendered by the taxpayer to show that its existence was justified by bona fide business purposes although as Mr. Fine tes-

---

**5.** The District Court held that this tax was improperly assessed against the tax-payer and the Government does not challenge that holding.

tified, "he was aware" of the tax results of the multiple corporations he caused to be organized.

The District Court found as ultimate facts: (a) that there was no real business purpose for the creation of the taxpayer corporation and that it derived no income from independent activities of a nature different from those of Adolph Fine, Inc., and Fine Realty, Inc.; (b) that the principal purpose for the acquisition of the taxpayer corporation by Adolph Fine was tax avoidance by securing the benefit of another corporate surtax exemption and excess profits credit which he would not otherwise enjoy; (c) that taxpayer was created for the purpose of acquiring property from other corporations controlled by the same stockholders and was not actively engaged in business in August, 1953, when it acquired the thirty-six lots from Fine Realty, Inc.; (d) that at the time of the formation of the taxpayer-corporation Adolph Fine, Inc., and Fine Realty, Inc., were conducting trades or businesses substantially similar to that of the taxpayer corporation during its taxable year ended November 30, 1953; (e) and that during its taxable year ended November 30, 1953, the taxpayer did not permit earnings or profits to accumulate beyond the reasonable needs of its business.

Accordingly, the court concluded that the Commissioner properly disallowed the surtax exemption and minimum excess profits tax credit under Sections 15 (c) and 129(a) (1) of the Internal Revenue Code of 1939.

■ The question presented here is whether control of the taxpayer was acquired by Adolph Fine for the principal purpose of avoiding federal income and excess profits taxes by securing the benefit of another surtax exemption and excess profits tax credit which he would not otherwise enjoy so that the disallowance of the exemption and credit was proper under Section 129(a) and under Section 15(c) as held by the District Court.

■ The determination by the District Court that Mr. Fine organized and acquired control of the taxpayer corporation for the principal purpose of tax avoidance was a finding of fact which is conclusive on this appeal if supported by substantial evidence and not clearly erroneous. Although Mr. Fine testified that in forming the taxpayer and eight other corporations he had in mind the two purposes of implementing his estate plan and of spreading and minimizing risks of loss from business reversal or tort liability and that tax saving was not the principal purpose, he admitted that he was aware of the tax consequences of the multiple corporate set up and testimony of his secretary and bookkeeper was to the effect that "she made adjusting entries" in the books of Adolph Fine, Inc., Fine Realty, Inc., and the development companies including taxpayer; that "a great deal of consideration was given to taxes" by Mr. Fine and his accountants and that "we were very careful to keep the figures under $25,000.00, the profit figures." An office memorandum from Mr. Fine made in 1957 concerning "the land status" of "the following companies" "to determine what company should own and develop" certain lands included the statement: "This will depend upon the possible profit status for the year 1957 in each of the companies." The tax returns of the various corporations formed by Mr. Fine as shown in the Exhibit B which the District Court included in its opinion shows that in 1950 the income from development and sale of homes reported by Adolph Fine, Inc. and Fine Realty, Inc. was $202,268.00 and $34,212.00. For the ensuing years 1951–1956 following the creation of the various development companies the taxable income of the two named companies dropped with but few exceptions to less than $25,000.00 and each of those companies reported less than $25,000.00. Notwithstanding Mr. Fine's testimony that avoidance of tax was not a prime consideration in splitting his home building business, there was substantial evidence to support the

finding of the Court that the principal purpose was to avoid federal income or excess profit tax by securing the benefit of deductions and credits which he would not otherwise enjoy.

■ Appellant contends here as it did below that creation of a new corporation and obtaining its stock is not an acquisition of the control of a corporation within the meaning of Section 129(a). The Court in rejecting the contention said [176 F.Supp. 310]:

"Although the legislative history and the case law under Section 129 indicate that it was aimed at the abuses of one corporation acquiring going concerns which had accrued certain tax exemptions, see J. E. Dilworth Co. v. Henslee, D.C.Tenn. 1951, 98 F.Supp. 957, 960 (dictum); Rudick, Acquisitions to Avoid Income or Excess Profits Tax: Section 129 of the Internal Revenue Code, 58 Harv.L.Rev. 196 (1944), there is no settled view that 'acquisition of control' cannot and should not include the organization of a new corporation such as was done here. See Alcorn Wholesale Co., 1951, 16 T.C. 75, 88; 7 Mertens, Federal Taxation, § 38.66, n. 75 (1956). The regulations promulgated under the 1939 Code provide that acquisition of control of a corporation may be accomplished by acquiring the stock of a newly organized corporation. Reg. 118, §§ 39.129–1(d) and 39.129–3(b) (2)."

We find no error in the Trial Court's ruling on this contention.

Appellant also contends that Section 129(a) cannot be used to deny an acquired corporation its normal surtax deduction and excess profits credit but is limited in its application to denying an acquiring corporation which has acted to evade federal tax the "credit deduction or allowance" it attempts to obtain through the acquired corporation. In ruling against this contention, the District Court said:

"Grammatically, this issue is presented in the interpretation of the words describing the method of tax avoidance. These are 'by securing the benefit of a deduction, credit, or other allowance which such [acquiring] person or corporation would not otherwise enjoy.' If the antecedent of 'which' is 'deduction, credit, or other allowance,' then section 129 should be limited to disallowing deductions of the acquiring person. However, if the antecedent of 'which' is 'benefit,' then the section can logically be applied to the deductions of the acquired corporation also, since the acquiring person will be benefiting from them. See Bernard, Acquisitions for Tax Benefit, 34 Cal.L.Rev. 36, 99–100 (1945).

"A line of Tax Court cases had established the former interpretation by enunciating the basic principle that section 129 applies only to deductions of the acquiring person and not to those of the acquired corporation. T. V. D. Co., 1957, 27 T.C. 879, 886; Chelsea Products, Inc., 1951, 16 T.C. 840, affirmed 3 Cir., 1952, 197 F.2d 620; WAGE, Inc., 1952, 19 T.C. 249; Berland's Inc. of South Bend, 1951, 16 T.C. 182; Alprosa Watch Corp., 1948, 11 T.C. 240 (dictum); see A. B. & Container Corp., 1950, 14 T.C. 842. However, recent courts of Appeal cases reflecting, I think, the better reasoning, have held that deductions of the acquired corporation may also be properly disallowed. Mill Ridge Coal Co. v. Patterson, 5 Cir., 1959, 264 F.2d 713; Coastal Oil Storage Co. v. Commissioner, 4 Cir., 1957, 242 F.2d 396.

"In the Coastal Oil Storage case, a parent corporation organized a subsidiary by transferring oil storage tanks to the subsidiary in exchange for its capital stock and a note. The business purpose motivating the transaction was allegedly to separate storage business under government contract from ordinary business. The Court found that the major purpose was tax avoidance

and that section 129(a) (1) could be employed to disallow the acquired subsidiary its normal surtax exemption and its minimum excess profits credit.

"The acquisition of going concerns for the purpose of obtaining their particular tax benefits was the major evil sought to be corrected by the enactment of section 129(a). S. Rep. No. 627, 78th Cong., 1st Sess. 27 (1944). But it was not the only one. This section was also aimed at correcting the abuse of splitting up a business enterprise for the purpose of obtaining extra surtax exemptions and excess profits credits. A 1951 Senate report on proposed amendments to the corporate surtax exemption provisions stated:

" 'It is not intended, however, that the exemption of the first $25,000 of a corporation's surtax net income from the surtax shall be abused by the splitting up, directly or indirectly, of a business enterprise into two or more corporations or the forming of two or more corporations to carry on an integrated business enterprise. It is believed that sections 45 and 129 will prevent this form of tax avoidance.' (S.Rep. No. 2375, 81st Cong., 2d Sess. 70.)

"Coastal Oil Storage affirmed that this intent was applicable to section 129(a) (1) as well as section 129(a) (2) long after the previously decided cases had made it doubtful.

"The corporate form cannot be used solely as an instrument of tax avoidance where there is no real business purpose motivating its use. Gregory v. Helvering, 1935, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596; Griffiths v. Commissioner, 1939, 308 U.S. 355, 60 S.Ct. 277, 84 L.Ed. 319; Higgins v. Smith, 1940, 308 U.S. 473, 60 S.Ct. 355, 84 L.Ed. 406. There was no real business purpose for the creation of James Realty Company.

"Whether the land transferred came from Fine himself, or from one of his corporations, the tax avoidance purpose seems clear. The potential income of Adolph Fine, Inc., and Fine Realty, Inc., were siphoned off to James Realty Co. and the evidence shows that the income from ownership of the developmental property was arbitrarily fragmentized into corporate units conveniently accruing just under $25,000 per year. Adolph Fine thus obtained the benefit of an extra set of surtax exemptions and excess profits credits that he would not otherwise have enjoyed and to which he was not entitled."

Shortly after the decision in this case, in September, 1959, the Tax Court handed down an elaborate opinion in Aldon Homes, Inc. v. Commissioner and Barca Corporation v. Commissioner on December 29, 1959, reported as 33 T.C. ——. The principal questions in the proceedings there before the Tax Court involving deficiencies in income tax for the period from June 1, 1951 to December 31, 1951, arose out of the use of multiple corporations in the development of a tract of land for residential purposes. Three individuals associated in the construction business in 1945 had profitably developed numerous tracts of land, built several thousand houses and acquired "fine reputations" by 1950. They started the enterprise acquiring land for homes development in Downey, California, in mid 1950, and having organized the corporations Aldon Homes, Inc., to do the actual work of development they organized 16 so-called alphabet corporations to function substantially the same as the multiple corporations in this case. After thorough consideration of all the circumstances and contentions, the Tax Court concluded "that the 16 alphabet corporations * * * were not organized for any purpose other than the obtaining of tax benefits; that they did not carry on the business activities which resulted in the profits from the development of Tract 17169, nor any substantial business activities and consequently did not earn the income in question; that

though legal entities in form, for purposes of taxation they were unreal and sham, and are to be disregarded."

In reaching its conclusion, the Tax Court recognized as axiomatic the right of taxpayers "to mold business transactions in a manner as to minimize the incidence of taxation" and that "no taxpayer is obligated to pay more tax than the law demands of him." United States v. Isham, 17 Wall. 496, 84 U.S. 496, 21 L.Ed. 728; Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596; United States v. Cumberland Public Service Co., 338 U.S. 451, 70 S.Ct. 280, 94 L.Ed. 251. But on the other hand, the Court declared as settled law that "the incidence of taxation depends upon the substance of a transaction" and that "to permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress." Commissioner of Internal Revenue v. Court Holding Co., 324 U.S. 331, 334, 65 S.Ct. 707, 708, 89 L.Ed. 981. As was earlier stated in Gregory v. Helvering, supra, [293 U.S. 465, 55 S.Ct. 268] "to hold otherwise would be to exalt artifice above reality and to deprive the statutory provision in question of all serious purpose." In National Investors Corp. v. Hoey, 2 Cir., 144 F.2d 466, 468, Judge Learned Hand pointed out that "to be a separate jural person for purposes of taxation, a corporation must engage in some industrial, commercial, or other activity besides avoiding taxation: in other words, that the term 'corporation' will be interpreted to mean a corporation which does some 'business' in the ordinary meaning; and that escaping taxation is not 'business' in the ordinary meaning." See Moline Properties, Inc. v. Commissioner, 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499; Jackson v. Commissioner, 2 Cir., 1956, 233 F.2d 289; National Carbide Corp. v. Commissioner, 336 U.S. 422, footnote 20, 69 S.Ct. 726, 93 L.Ed. 779.

Deficiencies had been assessed against Aldon Homes, Inc. and also against each of the alphabet corporations there created, but on the review in the Tax Court, that Court sustained the deficiencies under Section 45 and did not rule on the question here involved. The decisions of the District Court in this case and of the Tax Court in the Aldon Homes, Inc. case are in accord as to the conclusion that the multiple corporations created in both cases for the same purposes were created for the principal purpose of tax avoidance.

On the trial of this case in the District Court, the Taxpayer cited and relied on, i. a., British Motor Car Distributors, Ltd. v. Commissioner, 31 T.C. 437 where the Tax Court adhered to its ruling to the effect that section 129 "applies only to an acquiring corporation." It there appeared that in the years ending 1949, 1950, and 1951, the Empire Home Equipment Company, Inc. incurred net operating losses in the sum of $374,406.57 and reported its assets in its tax returns for 1951 as "nil". A partnership enjoying a successful business bought the outstanding capital stock of the Empire Company from its then owners and transferred the partnership assets (exclusive of the stock) to the Empire Company for additional shares of Empire stock. Empire thereafter had a successful business and attempted to carry forward its net operating losses of the prior years in its tax returns. The Tax Court permitted the carryover pursuant to its interpretation of 129(a). On the petition for review to the Ninth Circuit, 278 F.2d 392, 394, that Court held that as there was no business purpose in the transactions and the purpose was to obtain the tax benefit, the allowance of the deduction was forbidden by Section 129. The Court said:

"The Tax Court, in its construction of § 129(a) adhered to its view as expressed in T. V. D. Company, 27 T.C. 879 to the effect that 'it is manifest from the unambiguous terms of § 129 that it applies only to an acquiring corporation.' The court points out that here the corporation is seeking to make use of its

own previous loss; that it is the corporation, and not its new stockholders, which is securing the benefit of the deduction. Alprosa Watch is quoted to the effect that § 129(a) 'would seem to prohibit the use of a deduction, credit, or allowance only by the acquiring person or corporation and not their use by the corporation whose control was acquired.'

"We do not read the language of the section, 'securing the benefit of a deduction,' as applying only to the actual taking of such deduction by the taxpayer. We should be closing our eyes to the realities of the situation were we to refuse to recognize that the persons who have acquired the corporation did so to secure *for themselves* a very real tax benefit to be realized by them *through* the acquired corporation and which they could not otherwise have realized.

"This is not, as the corporation protests, a disregard of its corporate entity. Since § 129(a) is expressly concerned with the persons acquiring control of a corporation, we must recognize such persons as, *themselves*, having a significant existence or entity apart from the corporation they have acquired. To ignore such independent entity simply because such persons are also the stockholders of their acquisition is to ignore the clear demands of § 129(a). It is not the fact that they are stockholders which subjects them to scrutiny. Rather, it is the fact that they are the persons specified by the section: those who have acquired control of the corporation. They may not escape the scrutiny which the section demands by attempting to merge their identity with that of their acquisition.

"Section 129(a) contemplates that it shall not be limited to corporate acquirers. While Clause (2) is specifically limited to corporate acquirers, Clause (1) deals with 'persons' as acquirers. That Clause (1) is to include noncorporate acquirers could not be more clearly implied. Nor do we find any sound reason, if this device for tax avoidance is to be struck down, for doing the job only when the tax avoider is a corporation. Legislative history indicates that a much broader construction was intended.[6]

"To limit the effect of § 129(a) to cases in which the taxpayer is seeking to deduct as its own a loss incurred by another would seem to limit Clause (1) to corporate acquirers. Who but a corporation could claim as its *own* a loss which had been incurred by an acquired corpo-

6. H.R. No. 871, 78th Congress, First Session (1944 Cum.Bull. 901, 938):

"This section is designed to put an end promptly to any market for, or dealings in, interests in corporations or property which have as their objective the reduction through artifice of the income or excess profits tax liability.

"The crux of the devices which have come to the attention of your committee has been some form of acquisition on or after the effective date of the Second Revenue Act of 1940, but the devices take many forms. Thus, the acquisition may be an acquisition of the shares of a corporation, or it may be an acquisition which follows by operation of law in the case of a corporation resulting from a statutory merger or consolidation. The person, or persons, making the acquisition likewise vary, as do the forms or methods of utilization, under which tax avoidance is sought. Likewise, the tax benefits sought may be one or more of several deductions or credits, including the utilization of excess profits credits, carry-overs and carry-backs of losses or unused excess profits credits, and anticipated expense of other deductions. In the light of these considerations, the section has not confined itself to a description of any particular methods for carrying out such tax avoidance schemes but has included within its scope these devices in whatever form they may appear. For similar reasons, the scope of the terms used in the section is to be found in the objective of the section, namely, to prevent the tax liability from being reduced through the distortion or perversion effected through tax avoidance devices."

ration? Certainly an individual could not do so. The construction here contended for by the taxpayer corporation would then clearly frustrate legislative purpose.

"Such construction is not the necessary result of the language used. To construe 'benefit' as limited to the taking of the deduction; or 'deduction' as limited to one claimed by the acquirer is to read something into the section which is not expressly there and which serves to prevent its application in an area clearly intended to have been included.

"The corporation contends, as stated by the Tax Court, that the benefit to the stockholders (as distinguished from that to the corporate taxpayer) is too tenuous to bring the section into play. Tenuous or not, it is the benefit which actuated these persons in acquiring this corporation and is thus the very benefit with which the section is concerned. It is not for the courts to judge whether the benefit to the acquiring persons is sufficiently direct or substantial to be worth acquiring. That judgment was made by the acquirers. The judicial problem is whether the securing of the benefit was the principal purpose of the acquisition. If it was, the allowance of the deduction is forbidden. See: Mill Ridge Coal Co. v. Patterson, 5 Cir., 1959, 264 F.2d 713; Tarleau, Acquisition of Loss Companies, 1953, 31 Taxes, the Tax Magazine, 1050."

Since the submission of this appeal the Tax Court has handed down a decision in Thomas S. Snyder Sons Co. v. Commissioner, 34 T.C. ——, June 6, 1960 in which it follows the decision of the Ninth Circuit in Commissioner of Internal Revenue v. British Motor Car Distributors, Ltd., supra, in the interpretation of Section 129. It appeared in the Snyder Sons case that the taxpayer corporation was organized in 1949 and engaged in the business of developing and marketing corn pickers. It had net losses in 1950, 1951, 1952, and 1953. By 1953 it was out of the corn-picker business. Benjamin Snyder acquired control of taxpayer in 1953 by stock purchase. He transferred tank cars which he owned to the taxpayers for the transportation of molasses and merged into taxpayer his wholly owned corporation which bought and sold molasses. The taxpayer had profits in 1954, 1955, and 1956 from its molasses business. The Tax Court held that Benjamin Snyder's principal purpose for acquiring control of the taxpayer was to evade or avoid Federal income tax by securing to himself as sole shareholder the benefit of the taxpayer's net operating loss deductions, a benefit or deduction which he would not otherwise have enjoyed and under Section 129, I.R.C.1939 the taxpayer could not carry over its previous net operating losses against its profits for 1954, 1955, and 1956. The Tax Court stated:

"No useful purpose would be served in setting forth in extenso here the reasoning of the Ninth Circuit in its reversing opinion in Commissioner [of Internal Revenue] v. British Motor Car Distributors, Ltd., supra. It is sufficient to say that we now agree with that reasoning."

The court held section 129 of the Internal Revenue Code of 1939 to be applicable and the taxpayer's claim for a deduction for net operating loss carryovers was denied.

We are in accord with the interpretation of Section 129(a) in Mill Ridge Coal Co. v. Patterson, 5 Cir., 1959, 264 F.2d 713; Coastal Oil Storage v. Commissioner, 4 Cir., 1957, 242 F.2d 396; Commissioner of Internal Revenue v. British Motor Car Distributors, Ltd., 9 Cir., March 31, 1960, 278 F.2d 392, and Thomas S. Snyder Sons Co. v. Commissioner, June 6, 1960, 34 T.C. ——, and hold that the Trial Court was not in error in applying Section 129(a) and upholding the disallowance made by the Commissioner of the deduction and credit claimed by the taxpayer.

In view of our conclusion in this case that the deduction claimed by the taxpayer was forbidden by Section 129(a) it is not necessary for us to pass upon the application and effect of Section 15 (c) and we expressly refrain from doing so.

The judgment appealed from is Affirmed.