LEWISVILLE INVESTMENT COMPANY, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 6393–69, 6394–69, 6395–69.    Filed July 15, 1971.

---

[1] The proceedings of the following petitioners are consolidated herewith: Idaho Fresh Pak, Inc., Formerly, Fresh-Pak Processors, Inc., docket No. 6394–69; and Idaho Fresh Pak, Inc., successor in interest to Idaho Fresh-Pak Potatoes, Inc., docket No. 6395–69.

*John R. Kline, Peter Meloy,* and *David N. Niklas,* for the petitioners.

*Eugene P. Bogner,* for the respondent.

FEATHERSTON, *Judge:* Respondent determined income tax deficiencies as follows:

| Docket No. | Taxable year ending Aug. 31 | Amount |
|---|---|---|
| 6393–69 | 1965 | $60, 369. 88 |
| | 1966 | 87, 992. 10 |
| | 1967 | 47, 804. 39 |
| 6394–69 | 1965 | 7, 282. 63 |
| | 1966 | 10, 463. 79 |
| | 1967 | 7, 424. 30 |
| 6395–69 | 1965 | 6, 666. 67 |
| | 1966 | 6, 500. 00 |
| | 1967 | 6, 500. 00 |

Concessions have been made by the parties, and the issues remaining for decision are as follows:

(1) Whether Lewisville Investment Co. and Idaho Fresh-Pak Potatoes, Inc., were organized for the principal purpose of evasion or avoidance of Federal income tax, within the meaning of section 269(a),[2] by securing the benefit of the multiple surtax exemptions provided by section 11(c) and (d); and

(2) Whether the amounts paid by Lewisville Investment Co. to certain of its stockholders during its taxable years ending August 31, 1965, 1966, and 1967, were reasonable compensation for their services within the meaning of section 162(a)(1).

FINDINGS OF FACT

Petitioner Lewisville Investment Co. (hereinafter referred to as Lewisville), a corporation organized under the laws of Idaho, had its principal place of business in Lewisville, Idaho, at the time it filed its petition. Lewisville filed its Federal income tax returns for the taxable years ending August 31, 1965, 1966, and 1967, with the district director of internal revenue, Boise, Idaho.

Petitioner Idaho Fresh Pak, Inc., formerly Fresh-Pak Processors, Inc. (hereinafter referred to as Processors), and successor in interest to Idaho Fresh-Pak Potatoes, Inc. (hereinafter referred to as Sales), had its principal place of business in Lewisville, Idaho, at the time it filed its petitions. Processors and Sales both filed their Federal income tax returns for the taxable years ending August 31, 1965, 1966, and 1967, with the district director of internal revenue, Boise, Idaho.

---

[2] All section references are to the Internal Revenue Code of 1954, as in effect during the years in issue, unless otherwise noted.

Gale W. Clement and T. Ross Clement (hereinafter sometimes referred to as Gale and Ross, respectively, or sometimes collectively referred to as the Clements) are brothers who have lived in the Lewisville, Idaho, area all their lives. Their business interests include a livestock-feeding operation and a meat-packing plant. In addition, since 1945, they have engaged in the raising, buying, packaging, and selling of fresh potatoes.

A. Vernon Ball, Ronald J. Ball, and Leland W. Ball (hereinafter sometimes referred to as Vernon, Ronald, and Leland, respectively, or sometimes collectively referred to as the Balls) are brothers who have also spent most of their lives in the Lewisville, Idaho, area. Like the Clements, the Balls are engaged in a variety of agricultural and livestock operations, including a fresh potato business.

As shippers of fresh potatoes, both the Clements and the Balls experienced considerable difficulty in disposing of their culled or off-grade potatoes. A starch plant and a potato-processing operation were located approximately 15 miles from Lewisville, Idaho, to which the Clements and Balls took some of their off-grade potatoes, and there were other similar facilities greater distances away. However, these operations were not large enough to handle all the available culls, or were too far away to make it profitable to transport them. At times it was not possible to sell all the off-grade potatoes, and they were either held until the market eased or, on some occasions, were dumped into the river.

In about 1955, the Clements, in an attempt to provide a ready market for their off-grade potatoes, contacted representatives of the American Potato Co., which was contemplating building a new potato-processing plant, and tried to persuade them to locate the plant in Lewisville, Idaho. American Potato Co., however, decided to locate the plant in another area.

Thereafter, in 1958, the Clements and the Balls began discussing the possibility of financing and constructing their own potato-processing plant. In these discussions, they explored the various processing techniques that could be used, the manufacturing equipment which would be needed, the kind of plant required, how much money such an operation would take, how much of the available raw material supply they could consume, and the market for various products. They knew that other similar ventures had failed and were aware that serious financial risks were involved.

In early 1960, the Clements, the Balls, and several other investors consulted Hugh D. Galusha, Jr. (hereinafter Galusha), a lawyer and C.P.A., for the purpose of obtaining financial advice on various problems contemplated in establishing the potato-processing operation, including the form of organization to be used and the amount of capi-

tal required. The Clements and Balls initially wished to finance the operation largely with their own capital and borrowed funds. Galusha advised them, however, that, due to the seasonal nature of the raw material supply and the need to process the raw potatoes in a relatively short period of time, large amounts of capital would be necessary. In addition, he emphasized the desirability of completing construction of the operating plant in time to catch the 1960 season's harvest of potatoes. For these reasons, he suggested securing the participation of other investors.

By May 2, 1960, the Clements and Balls, as well as several other interested parties, had obtained enough commitments from potential investors to proceed with the project. On that date, the Clements and Balls, along with the other investors, agreed to enter into a joint venture under the name of Idaho Fresh Pak Potato Co. to carry on the potato-processing business. At that time they had not decided exactly how the business operation finally would be organized, and the joint venture arrangement was adopted primarily as a vehicle for the construction of the plant and processing facilities.

The joint venture agreement called for the contribution by each joint venturer of a specified amount of capital, which was to be deposited with the "Stakeholder," the Bank of Commerce, Idaho Falls, Idaho. The following schedule reflects the capital contributions of the several joint venturers:

| Name | Amount | Name | Amount |
|---|---|---|---|
| T. Ross Clement }<br>Gale W. Clement } | $50,000 | Roland L. Walker | $10,000 |
| | | Walter A. Clement | 5,000 |
| Lyle D. Taylor | | George L. Hart | 1,000 |
| A. Vernon Ball }<br>Ronald J. Ball }<br>Leland W. Ball } | 50,000 | Lamont Hart | 1,000 |
| | | Elwood Clifford | 10,000 |
| | | Menan Co-op | |
| Ira J. Taylor | 25,000 | Menan Produce Co | 10,000 |
| Delbert G. Taylor | 25,000 | Hunter Produce | 10,000 |
| Charles Lau | 25,000 | Grant Produce | 10,000 |
| Glen Stanger | 25,000 | William C. Olson | 25,000 |
| LeRoy Stanger | 25,000 | Melvin L. Clement | 10,000 |
| Lawrence W. Brown | | Don C. Lortz | 25,000 |
| Hollis Clement | 5,000 | Neal Erickson | 5,000 |

The parties agreed that a management group for the joint venture would be composed of three parties, each with one vote: One party would be the Clements—Gale and Ross; the second party the Balls—Vernon, Ronald, and Leland; and the third party a single individual chosen by the other joint ventures. The agreement further provided for compensation to be paid the Clements as a unit and the Balls as a unit for their work in developing the venture and for providing continued management of the business. This compensation was to be computed as follows:

Each of the two parties, "Clements" and "Balls", shall collectively be entitled to annual compensation to be fixed at the rate of 10% of the net profits before income taxes, to be paid annually not later than 90 days following the close of the fiscal years of the joint venture or its successor corporations during the life of this joint venture or its successors. It is understood by all parties that the managers have other interests and will not be required to devote their full time to the joint venture.

Ross and Gale agreed to share their compensation equally, and the Balls made a similar agreement. These arrangements within the two units did not reflect a division of job functions or the amounts of work to be done in the new business by the various individuals. Both units contemplated that the individual members thereof would continue to devote time to their other common and individual endeavors as well as the new enterprise.

On May 6, 1960, the joint venture organized three corporations under the laws of Idaho: Lewisville, Processors, and Sales. [3] At the time these three corporations were established, Galusha's studies indicated that the processing operation might be organized along three functional lines—management and ownership of the plant, manufacturing, and sales. At this stage, the joint venturers were not certain what role each corporation would play; consequently, they were not activated, and remained dormant until the plant was completed.

At the organizational meetings of the three corporations, each of them ratified the commitments in the joint venture agreement, including the provisions relating to the compensation of the Clements and the Balls. Voting trusts were established by each corporation to reflect the arrangements provided for in the joint venture agreement. Under each voting trust, the three votes of the management group were apportioned—one to the Clements, one to the Balls, and one to the single individual chosen by the other ventures.

The potato-processing operation involved the purchasing of raw material in the form of off-grade potatoes, the rather technical procedure of converting them into dehydrated mashed, diced, flaked, and au gratin potatoes, and the sale of these finished products. Although the Clements and the Balls had considerable experience in purchasing, raising, and selling fresh potatoes, their experience in and knowledge of the processed-potato industry was somewhat limited. To provide the technical expertise required for the construction and supervision of the processing plant, the joint venture hired Warren Denning (hereinafter Denning) in May 1960. His initial duties were to design the

---

[3] Lewisville was incorporated under the name of Lewisville Investment Co.; Processors was incorporated under the name of Potato Processors, Inc.; on Dec. 8, 1960, it changed its name to Fresh-Pak Processors, Inc., and as of Sept. 1, 1967, the name was changed to Idaho Fresh-Pak, Inc. Sales was incorporated under the name of Idaho Fresh-Pak Potatoes, Inc.; on Feb. 29, 1968, it merged into Idaho Fresh-Pak, Inc.

production lines for the processing operations. With his advice, the management group was to plan and supervise the construction of the needed facilities.

On October 15, 1960, when the processing plant was ready to begin operations, the joint venture was dissolved, and it transferred the land and plant to Lewisville. By a written agreement, Lewisville then leased those properties to Processors. At the same time, the joint venture transferred the machinery and equipment to Processors.

When the joint venture was dissolved, stocks and debentures in the three corporations in approximately a 40- to 60-percent ratio were issued to the joint venturers in the same proportion as they had provided the requisite capital. On August 31, 1961, the balance sheets for the corporations reflected capital stock and debentures as follows:

|  | Capital stock | Debentures | Total |
|---|---|---|---|
| Lewisville | $38, 715. 31 | $61, 135 | $99, 850. 31 |
| Processors | 107, 321. 43 | 172, 165 | 279, 486. 43 |
| Sales | 5, 573. 26 | 7, 090 | 12, 663. 26 |
| Total | 151, 610. 00 | 240, 390 | 392, 000. 00 |

Although separate books were kept for each corporation, they were all maintained by the employees of Lewisville. The information on the balance sheets and profit-and-loss statements of each corporation was presented to the shareholders in consolidated statements and reports.

From the commencement of operations through the years in issue, the officers of Lewisville, Processors, and Sales were the same. Gale served as president, Vernon as vice president, and Glen Stanger as secretary-treasurer. In addition, Gale, Ross, Vernon, and Ronald, along with various other members of the original joint venture, served as directors of all three corporations during the years in issue. Leland was not on the board of directors of any of these corporations.

In addition to holding title to the land and buildings, beginning on June 6, 1962, Lewisville provided all management, supervisory, and clerical employees for the entire business. Lewisville was compensated for these services by transfers of funds from Processors and Sales in the amounts of 115 percent of the employees' salaries. At the time of the trial, Lewisville employed 21 people.

Processors, in addition to owning all the manufacturing equipment and machinery, during the years in issue employed all the seasonal labor needed to run the potato-processing operation, as well as some permanent nonsupervisory personnel. Processor's labor force ranges from 150 to 500 persons. Its operations consist of processing the raw potatoes into various dehydrated products. Although the processing

operations are conducted during only 10 months of the year, a labor force is retained during the other 2 months to rebuild and repair the equipment in preparation for the next production season.

While it was originally planned that Sales would handle the marketing program for the business and would eventually create a subsidiary corporation in each State to handle a variety of food products, this part of the plan never materialized. On October 15, 1960, Sales entered into an exclusive agreement with Arthur Oppenheimer '(hereinafter Oppenheimer), a food broker, to sell the finished processed potatoes. Although Oppenheimer used the title of "Vice President in Charge of Sales," the agreement between him and Sales gave him an exclusive sales agency with respect to the entire production. Paid on a commission basis, Oppenheimer maintained his sales office in Boise, Idaho. He employed salesmen and an office staff who worked on his account with Sales, as well as his other accounts. Oppenheimer sold the processed potatoes either directly to customers, through his own network of brokers, or through arrangements with other food brokers.

On June 12, 1965, the arrangement with Oppenheimer was terminated. Thereafter, salesmen employed by Lewisville and formally assigned to Sales as part of the management services handled the sales of the processed potatoes. The activities of these salesmen were much the same as those carried on by Oppenheimer. About 95 percent of the sales of the processed potatoes were made through brokers, and only about 5 percent were sold directly to customers. The sales work was conducted principally from Lewisville, Idaho. All billings, collections, distributions, and clerical work involved in making the sales were handled by employees of Lewisville. Sales employed no one directly and never carried an inventory of products to be sold.

The following appears in the minutes of the annual stockholders meeting of Sales, held October 4, 1966:

President Clement introduced the idea of merging two companies into one. The Fresh-Pak Processors, Inc. and the Idaho Fresh-Pak Potatoes, Inc. [Sales] He explained that the Board of Directors had met with favor on this proposal and they had suggested it be presented to the Stockholders for approval. He called upon Mr. Ron Hamilton, Company Comptroller, to explain how the merger could be done.

Mr. Hamilton reviewed the reason why more than one company was formed in the beginning. It would be an advantage "tax-wise". But, now the companies had grown until there was too much confusion and too many problems. He told the group that by merging the two companies we will lose $6,500.00 tax-saving, but this income will be more than offset by overcoming the present duplication of effort. The merger would be tax free and the stock from Fresh-Pak Processors, Inc. would be transferred to the stockholders of Idaho Fresh-Pak Potatoes, Inc. on the basis of their present participation. After some discussion, Mr. Delbert Taylor made the following motion: "The Fresh-Pak Processors, Inc. and the Idaho Fresh-Pak Potatoes, Inc. be merged into one company, to be known

as the Idaho Fresh-Pak, Inc. And that the stock from the Fresh-Pak Processors, Inc. be transferred to the stockholders of the Idaho Fresh-Pak Potatoes, Inc. on the basis of the stockholders present participation of stock in said companies." Mr. William C. Olson seconded the motion and the motion passed unanimously.

In the minutes of a board of directors meeting held November 1, 1966, for Sales it was stated: "The book work involved in keeping these two companies separated has reached the point where it is absorbing all the tax advantages that are gained."

In early 1968, Sales was merged into Processors.

No specific management duties or obligations were delegated to any particular individual member of the Clement or Ball units, and no member of the management group was required devote his full time to the operation. Denning, as general manager, was charged with the duty of supervising the day-to-day activities, and he reported to the management group.

Gale, in addition to serving as a director and president of all three corporations during the years involved herein, was active in the management of the entire operation. He visited the processing plant daily and participated in many of the operational decisions required in the business. In addition to his activities in the potato-processing business, Gale was active in other businesses and public service endeavors.

Ross was a director in all three corporations. In addition, as a member of the management group, he served as an adviser on the operation of the business. Although he spent some time at the plant, he did not devote as much time to the management as did his brother.

Vernon, while serving as vice president and a director of all three corporations, also participated fairly actively in the management decision-making, as well as the operational, aspects of the processing business.

Ronald, in addition to serving on the board of directors of all three corporations, was primarily responsible for purchasing the raw potatoes used in the business. While he belonged to the management group, his activities in this regard were primarily in an advisory capacity.

Leland was not a director of any of the corporations; nor was he actively engaged in any of the management operations. His main contribution was in the form of public relations and relaying general information that he obtained in his travels in conjunction with the Balls' other business interests. He was called upon to serve in an advisory capacity from time to time.

The following schedule reflects for the years in issue the amounts of compensation paid to the Clements and Balls under the provisions originally set forth in the joint venture agreement and subsequently ratified by the corporations:

|  | Amounts claimed taxable years ending— | | |
|---|---|---|---|
|  | 8/31/65 | 8/31/66 | 8/31/67 |
| Gale W. Clement | $45, 118. 02 | $53, 786. 32 | $34, 073. 37 |
| T. Ross Clement | 45, 118. 02 | 53, 786. 32 | 34, 073. 37 |
| A. Vernon Ball | 30, 078. 68 | 35, 857. 54 | 22, 715. 58 |
| Ronald T. Ball | 30, 078. 68 | 35, 857. 54 | 22, 715. 58 |
| Leland W. Ball | 30, 078. 68 | 35, 857. 54 | 22, 715. 58 |
| Total | 180, 472. 08 | 215, 145. 26 | 136, 293. 48 |

The following schedule shows the gross sales of the potato-processing business from the time of its inception through the years in issue:

| Year ending Aug. 31— | Gross sales | Year ending Aug. 31— | Gross sales |
|---|---|---|---|
| 1961 | $787, 619. 06 | 1965 | $7, 644, 328. 47 |
| 1962 | 1, 839, 390. 91 | 1966 | 7, 428, 198. 88 |
| 1963 | 2, 370, 686. 89 | 1967 | 7, 390, 039. 14 |
| 1964 | 3, 703, 050. 39 | | |

In the notices of deficiency in docket Nos. 6394–69 and 6395–69, respondent, relying upon section 269, disallowed the surtax exemptions claimed by Processors and Sales and determined that a surtax exemption was to be allowed to Lewisville. He also allocated the net income of Sales and Processors to Lewisville under sections 61 and 482. At the trial, respondent conceded the issues as to the allocations under sections 61 and 482. While he maintained that two of the three surtax exemptions were not allowable, he conceded that Processors was entitled to a surtax exemption, but alleged in an amended answer that Lewisville was not.

In the notice of deficiency in docket No. 6393–69, respondent determined that the compensation paid to the Clements and to the Balls was, in part, unreasonable. He allowed a deduction for the compensation paid to Gale and Vernon; and determined that an annual salary of $10,000 for the years in issue was reasonable compensation for Ross and Donald, disallowing the excess. He also disallowed as a deduction all compensation paid to Leland.

ULTIMATE FINDINGS OF FACT

1. The principal purpose of the formation of Sales was to obtain the benefit of a surtax exemption; but Lewisville was organized for principal purposes other than tax avoidance.

2. The compensation paid to the Clements as a unit and to the Balls as a unit was reasonable in amount.

OPINION

The first issue is whether the principal purpose for which Lewisville and Sales were organized was the "evasion or avoidance" of income

tax within the meaning of section 269. In this connection, section 11(d) specifies that, in computing the surtax of a corporation as prescribed by section 11(c), an exemption of $25,000 shall be allowed. Section 269(a) provides, however, that if any person or persons acquire control of a corporation and the principal purpose of the acquisition is the evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which would not be otherwise allowable, the Secretary or his delegate may disallow such deduction, credit, or other allowance.

It is now settled that the acquisition of control of a corporation, as used in section 269, includes the formation of a new one, *James Realty Co.* v. *United States*, 280 F.2d 394 (C.A. 8, 1960); *Kessmar Construction Co.*, 39 T.C. 778 (1963), affd. 336 F.2d 865 (C.A. 9, 1964). Indeed, the organization of two or more corporations instead of a single one in order to secure the benefit of multiple surtax exemptions is one of those situations which, in the absence of evidence to the contrary, is indicative that the principal purpose of the acquisition was evasion or avoidance of Federal income tax. Sec. 1.269-3(b)(2), Income Tax Regs.

Whether or not the formation of multiple corporations serves valid purposes apart from the securing of multiple surtax exemptions is a factual issue, *Concord Supply Corporation*, 37 T.C. 919 (1962). Ascertaining the principal purpose of creating more than one corporation "requires a scrutiny of the entire circumstances in which the transaction or course of conduct occurred, in connection with the tax result claimed to arise therefrom." Sec. 1.269-3(a)(2), Income Tax Regs. Quite obviously, the purposes for organizing each of the corporations here in dispute and the circumstances surrounding their formation, as well as the corporation's activities, are relevant in reaching our decision.

We do not think petitioners have shown that the principal purpose of forming Sales was not the avoidance of taxes. Galusha, who recommended the formation of the three corporations, testified that he visualized the organization of their activities along functional lines, with Lewisville owning the major fixed assets, Processors doing the manufacturing, and Sales handling the sales work. He foresaw the establishment of a separate subsidiary sales corporation in each state in which the processed potato products would be sold. He also contemplated that other food products would be marketed through the Sales corporations.

Pursuant to Galusha's recommendation, the three corporations were formed on May 6, 1960; and, if Galusha's plan for Sales had been followed, we think a reasonable argument could have been made for allowing it a surtax exemption. However, Galusha was not a member of the joint venture group; he served merely as an adviser, and his testimony, therefore, must be viewed in that light. Of greater im-

portance is the available evidence concerning what actually transpired prior to and at the commencement of Sales' operations in October 1960. The "immediate, proximate, and reasonably to be anticipated consequences" of those actions is strong evidence that the principals intended "to accomplish their consequences." *Army Times Sales Co.*, 35 T.C. 688, 704 (1961); *J. T. Slocomb Co.*, 38 T.C. 752, 758 (1962), affd. 334 F.2d 269 (C.A. 2, 1964). The evidence of what transpired with regard to Sales is not consistent with Galusha's plans for establishing it. See, generally, *Kessmar Construction Co.* v. *Commissioner*, 336 F.2d 865 (C.A. 9, 1964), affirming 39 T.C. 778 (1963); *Made Rite Investment Co.* v. *Commissioner*, 357 F.2d 647 (C.A. 9, 1966), affirming per curiam 41 T.C. 762 (1964).[4]

Between May 1960, when the corporations were created, and October 1960, when the enterprise was launched, the plans for the use of Sales quite obviously changed. We think this later date is the crucial one, since, until that time, all the corporations were mere shells, dormant, and awaiting the joint venture's completion of the plant. During this interim period, it was decided that the Clements and Balls, as managers, would not undertake the building of a sales organization; instead, the arrangement with Oppenheimer was worked out, and he rather than Sales carried all responsibility for the sales work. On October 15, 1960, he was given an exclusive commission sales contract, and this arrangement continued until June 12, 1965. Oppenheimer sold all the products either directly to customers or through food brokers; he maintained his own sales offices in Boise, Idaho; he employed his own salesmen and office staff. He was not an employee of Sales or either of the other two corporations.

On June 12, 1965, the Oppenheimer contract was terminated, but Sales never launched a program of its own. All except about 5 percent of the sales were made through brokers, and all of the sales work was carried on by individuals who were paid by Lewisville. Even though the potato products were sold countrywide, no other sales corporations were ever organized as visualized under Galusha's original plan.

In 1968, Sales was merged into Processors, and the minutes of a 1966 stockholders meeting, where this course of action was considered, indicate that "the reason why more than one company was formed in the beginning" was that it would be "an advantage 'tax-wise'" and that "now the companies had grown until there was too much confusion and too many problems" and the tax-saving "will be more than offset by overcoming the present duplication of effort."

---

[4] For a discussion of those factors affecting judicial determinations of the principal purpose for organizing a corporation under sec. 269, see Sanders, "Evaluating and Marshalling the Defense in a Multiple-Corporation Case," 30 J. of Taxation 86 (1969); Notes, "State of Mind Analysis in Corporate Taxation," 69 Col.L.Rev. 1224 (1969).

Thus, from its commencement and during its entire existence, Sales never had any employees or separate office space. It never had any inventory. It purportedly paid Lewisville for management services; but, in the final analysis, the only services involved were the keeping of a set of books reflecting the channeling of processors' products through it. When this bookkeeping became more expensive than the projected tax-saving, Sales was liquidated.

While there is some evidence to the contrary, on consideration of the record as a whole, we do not think it has been shown that Sales was not formed and maintained as a separate entity principally to take advantage of the surtax exemption. See *Joe (Joseph) Dillier*, 41 T.C. 762, 788 (1964), affirmed per curiam sub nom. *Made Rite Investment Co.* v. *Commissioner*, 357 F.2d 647 (C.A. 9, 1966); *Concord Supply Corporation, supra; James Realty Co.* v. *United States, supra.*

As to Lewisville, we think the opposite answer is required. Since respondent for the first time alleged in his amended answer that Lewisville should be denied the surtax exemption, the burden of proof rested with him, *Sheldon Tauber*, 24 T.C. 179, 185 (1955), and he does not contend otherwise. We do not think he has carried his burden.

Galusha's testimony indicates that Lewisville was established, in part, for the purposes of insulating the value of the plant and lands from the potential liabilities of the processing operations. From the outset, Lewisville held title to the land and plant and thereby protected their value from potential claims. Consistent with Galusha's plan, it employed the management and supervisory personnel for the entire operation, while Processors operated the plant and employed the seasonal and nonsupervisory workers required for its operation. This division of personnel facilitated the development of a deferred compensation plan for the executive and supervisory employees, and simplified the handling of relations with the nonsupervisory workers. While a single corporation might have been organized to own and manage the entire operation, the enterprise's investors were entitled to adopt any form they desired, and that form cannot be ignored merely because it resulted in tax-saving, *Aldon Homes, Inc.*, 33 T.C. 582, 596–597 (1959). Viewing the evidence as a whole, we hold Lewisville was organized for principal purposes other than tax avoidance. See, generally, *Berland's Inc. of South Bend*, 16 T.C. 182 (1951), acq. 1951–2 C.B. 1; *Goemans* v. *Commissioner*, 279 F.2d 12 (C.A. 7, 1960), affirming *John P. Wagner*, T.C. Memo. 1958–112.

As to the compensation issue, section 162(a)(1) allows "as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business," including "a reasonable allowance for salaries or other compensation for personal services actually rendered." The regulations (Income Tax Regs., sec.

1.162–7(b)(2) and (3) recognize that contracts may be entered into by an employer with an employee, making the amount payable contingent upon the net profits of the enterprise as follows:

(2) The form or method of fixing compensation is not decisive as to deductibility. While any form of contingent compensation invites scrutiny as a possible distribution of earnings of the enterprise, it does not follow that payments on a contingent basis are to be treated fundamentally on any basis different from that applying to compensation at a flat rate. Generally speaking, if contingent compensation is paid pursuant to a free bargain between the employer and the individual made before the services are rendered, not influenced by any consideration on the part of the employer other than that of securing on fair and advantageous terms the services of the individual, it should be allowed as a deduction even though in the actual working out of the contract it may prove to be greater than the amount which would ordinarily be paid.

(3) In any event the allowance for the compensation paid may not exceed what is reasonable under all the circumstances. It is, in general, just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances. The circumstances to be taken into consideration are those existing at the date when the contract for services was made, not those existing at the date when the contract is questioned.

One feature of the May 2, 1960, joint venture agreement called for the Clement brothers as one unit and the Ball brothers as another unit to serve as managers of the potato-processing enterprise and for each unit to receive as compensation for its services 10 percent of the net profits before taxes. Together the two units invested about 28 percent of the initial capital required for the venture ($100,000 of $352,000), and about 20 other individuals and corporations supplied the remainder of the capital. The stock and debentures of the three corporations were issued proportionately. There is no evidence that any of the provisions of this joint venture agreement were not negotiated at arm's length, or that the other investors had any reason to contrive a scheme to syphon to the Clements and the Balls the earnings of the business in the guise of compensation.

"The courts and the Treasury Regulations have long recognized the contingent method of fixing compensation, paid pursuant to a free bargain uninfluenced by any consideration other than securing on fair and advantageous terms the services of the individual." *Streckfus Steamers, Inc.*, 19 T.C. 1, 6 (1952), acq. 1953–1 C.B. 6; *California Vegetable Concentrates, Inc.*, 10 T.C. 1158 (1948), acq. 1948–2 C.B. 1; *Draper & Co.*, 5 T.C. 822 (1945), acq. 1946–1 C.B. 2; Income Tax Regs., sec. 1.162–7. Viewing the contingent compensation agreement as of May 2, 1960, there is simply no reason to question its bona fides or its reasonableness. The enterprise which the investors were launch-

ing was a risky one, and none of them knew whether or not it would succeed. That the risk proved to be a good one is no ground for saying that the agreement was not a free bargain.

The evidence shows that the Clements as a unit and the Balls as a unit provided fully adequate management services. In pursuance of the agreement, they took primary responsibility for planning and supervising the construction of the plant, planning the purchase of potatoes for processing, developing a sales program, and providing policy direction and management for the business as it developed. Unlike other similar potato-processing enterprises, this business under their direction has enjoyed phenomenal success, its gross sales increasing from $787,000 in the initial year to over $7,600,000 in 1965, $7,400,000 in 1966, and $7,300,000 in 1967. The net profits have also increased. The investors in the enterprise have received their money's worth.

Respondent does not make a frontal attack on the agreement as such. Rather he seeks to analyze separately the services performed by each of the Clement and Ball brothers and argues that, particularly in view of their other extensive business activities, they did not earn the amounts paid to them individually.

In the light of the unique facts here presented, we think this approach is erroneous. Section 162(a)(1) is directed to the reasonableness of the compensation *paid* by the taxpayer for the services actually rendered to it rather than to the taxability of the compensation in the hands of the recipients. In this case, the joint venture agreement did not specify the service to be performed by particular individuals. Rather it treated the Clements as a unit and the Balls as a unit, leaving to them the decision as to which ones of them would perform the services required for the enterprise, and how they would share the compensation paid to their respective units. We are not here concerned with how that compensation should be taxed in the hands of the members of each unit, but whether the total amount paid to each unit was reasonable. The situation is analogous to a joint venture providing management services for a corporation on a commission basis; in those circumstances the issue would be whether the total compensation paid for the services actually rendered was reasonable, not whether each member of the joint venture earned as much thereof as was allocated to him. For the reasons stated, we think the deduction is allowable. See, e.g., *Midland Ford Tractor Co.*, T.C. Memo. 1958-213, affd. 277 F.2d 111 (C.A. 8, 1960), certiorari denied 364 U.S. 881 (1960).

To properly reflect our Findings and the concessions made by the parties,

*Decisions will be entered under Rule 50.*