CENTRAL FREIGHT LINES, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Central Freight Lines, Inc. v. Commissioner
Docket No. 7151-74.
United States Tax Court
T.C. Memo 1976-25; 1976 Tax Ct. Memo LEXIS 379; 35 T.C.M. (CCH) 85; T.C.M. (RIA) 760025; January 29, 1976, Filed Sam J. Dealey,Vester T. Hughes, Jr., and Anderson Wallace, Jr., for the petitioner. John D. Copeland, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent has determined the following deficiencies in petitioner's Federal income taxes: Year
Deficiency
1969
$16,173.00
1970
66,491.00
Total
$82,664.00
Other issues having been settled by the parties, the only issue remaining for decision is whether amounts paid to petitioner's chairman of its board of directors, W. W. Callan, Sr., were reasonable compensation for his services within the meaning of section 162(a)(1). [1]/ *380 FINDINGS OF FACT Petitioner, Central Freight Lines, Inc. (hereinafter petitioner or Central), was a Texas business corporation with its principal place of business in Waco, Texas, at the time of filing its petition. Central timely filed its corporate Federal income tax returns for 1969 and 1970 with the Internal Revenue Service Center, Austin, Texas. Central was established in 1925 by W. W. Callan, Sr. (hereinafter Callan), who started in the motor freight business by driving a single truck between Waco and Dallas, Texas. Central was incorporated in 1929 and at the time of the trial was the largest intrastate motor carrier in Texas. During 1969 and 1970, Central operated over 1,100 trucks between 650 Texas cities and towns. After its incorporation, Central expanded primarily by acquiring numerous one-man trucking firms and by hiring employees from various rival motor carriers. Callan was the controlling shareholder during this period and was responsible for Central's growth and expansion. During World War II, Callan was called into the military service for approximately 2-1/2 years. During his absence, the company was run by four long-time employees of Callan. Upon his return *381 from military service, Callan decided that the company's growth and the increasing complexity of the motor freight business made necessary a reorganization of Central's management structure. By reorganizing Central, Callan hoped to establish a clear-cut chain of command between management and labor and more clearly define responsibilities at every managerial level. Callan was also convinced that no one individual could handle both long-term planning and research functions, which were necessary for growth and expansion, as well as supervise the day-to-day operations of moving freight. In 1952, Callan reorganized Central by adopting an executive committee form of management. Pursuant to this plan, Callan stepped down as president of Central, a position he held since the inception of the company, and became chairman of the board of directors. R. H. Linam, a long-time employee of Central, became president of the company, and the executive committee was comprised of Callan, Linam and W. W. Callan, Jr., the executive vice-president and treasurer of Central. Since the reorganization, Callan has devoted his time to developing Central's policies on operations, expansion, and management, *382 and is generally considered by those dealing with Central to be the company's spokesman in any important negotiations on behalf of the company. Callan's activities during 1969 and 1970 included a review of Central's monthly financial statements as well as periodic operating reports of its subsidiaries Alamo Express Company and Alamo Cartage Company, corporations in which Central owns a 47.4 percent interest. Callan also made inspection trips to Central's various operating terminals throughout the State of Texas. These inspection trips were made, in part, to enable him to keep abreast of any labor problems among Central's employees. During 1969, Callan personally discharged the manager of Central's Houston terminal because, in Callan's opinion, the manager was not properly carrying out Central's operating policies. Callan was also personally responsible for accepting the resignation of Central's Ft. Worth terminal manager in 1969 and designating a replacement for that job. In both instances, Callan made the decision to terminate these managerial employees and later informed the other members of the executive committee, Linam and W. W. Callan, Jr., of his action. Callan was also *383 Central's sole spokesman in dealing with labor unions, in particular the Teamsters Union, which from time to time have attempted to organize Central's employees. In all dealings with the labor unions and in all legal proceedings resulting therefrom, Callan directed Central's negotiations and personally retained and directed attorneys to represent Central when their services were necessary. Callan was also responsible for the rate and revenue policies of Central. He based his decisions, in part, on an analysis of Central's operating and financial statements. In general, Callan estimated that if Central were to be profitable, it had to maintain a 7 percent profit margin, meaning that 7 cents of every dollar of freight revenue would be Central's profit. Callan also closely watched labor costs, which generally ran between 50 to 60 percent of Central's total operating expenditures. When Central's profit margin fell under 7 percent, Callan would consider the advisability of requesting a rate increase through the Texas Railroad Commission in order to generate additional revenues as well as measures to reduce operating costs. In both 1969 and 1970, Callan concluded that rate increases were *384 necessary, and he served as Central's spokesman in hearings before the Texas Railroad Commission. In both cases, Callan was successful in obtaining the needed rate increase authorization. During 1969, Callan became interested in expanding Central's operations into East Texas, an area which was then serviced by other motor carriers. Callan began negotiations with several competing freight lines to purchase their certificates of public convenience in the East Texas area. Through Callan's efforts, Central was able to purchase rights to operate between Waco and Hempstead, Texas, from Red Ball Motor Freight Lines. Callan wished to further expand Central's operations to other East Texas areas, and he made several surveys, inspecting both the industrial capacity of the areas and possible terminal locations. In January 1970, Callan reported to Central's board of directors, outlining his East Texas expansion plans and summarizing his efforts to that date. During that year, Callan attempted to purchase several additional existing operating certificates from competing freight lines but was unsuccessful. In May 1970, Central applied to the Texas Railroad Commission for the issuance of new *385 operating certificates. From the date of the filing of the applications until the hearings before the Texas Railroad Commission in September, Callan personally directed the preparation of Central's presentation before the Commission and was Central's leading witness at the hearings, which were conducted from September through November of 1970. The hearing examiner recommended that Central be granted substantially all of its expansion requests. Central was formally awarded operating certificates for its East Texas routes in May 1971. Since expanding the operation into East Texas, Central has invested approximately $10 million in that area, and the operating certificates alone have a value exceeding $1 million. Beginning in 1953, Central has consistently operated profitably. From 1953 through 1970, gross revenues increased from $7,223,064 to $40,146,185, taxable income increased from $590,894 to $3,340,059, and starting in 1954, dividends have been paid each year. Central's gross revenues, taxable income, and dividends paid for the years 1953-1974 are as follows: Year
Gross Revenues
Taxable Income
Dividends Paid
1953
$ 7,223,064
$ 590,894
1954
8,486,156
708,524
$ 117,203
1955
9,989,792
1,024,852
119,896
1956
10,968,039
593,971
164,301
1957
12,196,225
811,828
183,339
1958
13,2 25,322
1,133,456
189,076
1959
14,765,818
836,890
194,606
1960
15,026,921
650,334
196,495
1961
16,160,033
1,493 ,011
192,799
1962
17,236,151
1,402,682
195,294
1963
17,980,067
1,057,139
198,076
1964
19,708,912
1,514,962
199 ,329
1965
22,235,218
1,390,491
199,867
1966
25,353,214
1,518,070
199,917
1967
28,015,965
1,755,054
249,882
1968 32,241,229
1,445,598
249,354
1969
34,813,815
1,310,848
244,478
1970
40,146,185
3,340,059
243,723
1971
47,772, 289
3,818,164
249,972
1972
58,836,636
5,599,021
249,994
1973
68,862,991
2,977,247
254,476
1974
79,318,203
3,578,107
277,563
*386 Prior to 1948, Callan and his family owned all of Central's outstanding stock except for one qualifying share held by one of Central's employees. Since 1951, employees with over 1 year of service with Central were given the opportunity to invest in the company's stock. By 1969, over 325 employees and their families held 123,358 of 243,568 outstanding shares. In 1969, Callan and his family owned 49.35 percent of Central's outstanding stock, and in 1970 their percentage was 48.69. In 1951, Callan recommended that Central institute an executive contingent compensation plan whereby top managerial personnel of Central would be paid a relatively low base salary but would share in Central's profits at a set percentage. Callan believed that the contingent compensation plan would work as an incentive to the individual managers and executives because they would have "a piece of the action." The plan was adopted at or about the time of the reorganization. As adopted, the plan provided that designated employees would receive a set percentage of the company's profits each year. The plan had no down-side protection for any participant, in that the percentage shares remained constant in both *387 good and bad years. Because the participants in the plan would directly benefit from Central's successful operations, Callan believed the contingent compensation plan would motivate each man to give his best effort to his work. At all times since 1953, Callan's compensation has consisted of a base salary plus a percentage of Central's profits. His base salary has at all times remained $15,000 per year. His percentage share of Central's profits initially was 5 percent but was lowered to 3 percent in December 1958. Since 1953, Callan's total yearly compensation from Central has ranged from a low of $29,043 in 1953 to a high of $115,024 in 1970. During 1969 and 1970, 23 of Central's employees (including Callan) were compensated under the contingent bonus plan. Each individual was paid a base salary ranging from a low of $8,900 in 1969 and $9,610 in 1970, to a high of $15,000 in both years. The bonus percentage ranged from.25 percent to 3 percent. Callan and Linam were the highest compensated employees, both being paid a $15,000 base salary plus 3 percent of Central's profits in 1969 and 1970. The following is a summary of the compensation paid to Central's employees pursuant to the *388 contingent compensation plan: 1969
Total Individual
Salary
Percentage
Bonus
Compensation
W. W. Callan
$15,000
3
$41,857
$56,857
R. H. Linam
15,000
3
41,857
56,857
T. H. Callan
12,000
2
27,905
39,905
W. W. Callan, Jr.
12,000
2
26,404
38,404
W. H. Johnson
10,000
1.5
20,928
30,928
W. C. Lackey
10,000
1.5
20,582
30,582
W. C. Shaw
9,538
1.25
17,440
26,979
J. W. Carolan
10,000
1.25
17,094
27,094
H. B. Lewis
10,000
1
13,606
23,606
M. A. Taylor
10,000
1
13,952
23,952
W. W. Money
10,000
1
10,464
20,464
H. L. Patterson
9,500
.75
10,464
19,964
C. R. Jaynes
10,000
.75
10,118
20,118
M. D. Dooley
9,650
.75
8,380
18,030
H. W. Dodd
8,900
.50
6,976
15,876
J. R. McConnaughey
9,500
.25
3,488
12,988
J. E. Moore
9,260
.25
2,772
12,032
W. P. McMahan
10,000
.25
3,488
13,498
R. A. Hulme
10,530
.50
3,488
14,018
R. F. Broaddus
9,610
.25
3,488
13,099
L. L. Schroeder
11,590
.50
750
12,340
M. C. Cothran
12,770
750
13,520
D. C. Thompson
10,000
10,390
1970
W. W. Callan
$15,000
3
$100,023
$115,023
R. H. Linam
15,000
3
100,023
115,023
T. H. Callan
12,000
2
66,682
78,682
W. W. Callan, Jr.
13,000
2.5
74,513
87,513
W. H. Johnson
10,000
1.5
50,012
60,012
W. C. Lackey
10,000
1.5
50,012
60,012
W. C. Shaw
10,000
1.25
41,676
51,676
J. W. Carolan
10,000
1.25
41,676
51,676
H. B. Lewis
10,000
1
33,341
43,341
M. A. Taylor
10,000
1
33,341
43,341
W. W. Money
10,000
1
33,341
43,341
H. L. Patterson
$10,000
.75
$25,000
$35,000
C. R. Jaynes
10,000
.75
25,000
35,000
M. D. Dooley
10,000
.75
25,000
35,000
H. W. Dodd
10,010
.50
16,670
26,680
J. R. McConnaughey
10,010
.25
8,335
18,345
J. E. Moore
10,010
.25
8,335
18,345
W. P. McMahan
10,010
.25
8,335
18,345
R. A. Hulme
10,530
.50
16,670
27,200
R. F. Broaddus
9,610
.25
8,335
17,945
L. L. Schroeder
11,310
.75
22,378
33,688
M. C. Cothran
11,661
3,250
14,911
D. C. Thompson
10,010
.25
6,040
16,050
*389 While serving as chairman of Central's board of directors, Callan has operated a cattle ranch located approximately 20 minutes from Central's Waco offices. Callan became interested in the cattle and quarter-horse breeding business after he acquired the ranch property in 1944 and since that time has engaged in breeding and marketing Santa Gertrudis cattle locally and abroad. Callan's ranching activities require a full-time staff of 12 employees including 3 managers. The managers report to Callan periodically concerning the various ranching operations. On a daily basis, approximately 30 percent of Callan's time was spent on his ranching interests, the remainder being devoted to Central's activities. Twice during 1969 Callan traveled abroad to promote his cattle sales. On both occasions, Callan satisfied himself that Central had no major, immediate problems before he left the country. Callan left an itinerary with Central in order that he might be contacted in an emergency. Callan also reviewed and studied all of Central's weekly operating statements during his absence and kept abreast of all developments in the company's operations. Respondent determined that Central's compensation *390 payments to Callan for 1969 and 1970 in excess of the respective amounts of $50,000 and $52,500 did not constitute reasonable compensation and, therefore, were not allowable as deductions under section 162(a)(1). OPINION Section 162(a)(1) permits a deduction for reasonable compensation paid to employees. The issue of whether the amounts paid to Callan during 1969 and 1970 constituted reasonable compensation is factual, and the burden of proof rests with petitioner. Botany Mills v. United States,278 U.S. 282 (1929); Dielectric Materials Co.,57 T.C. 587, 591 (1972). Petitioner argues that the contingent compensation plan adopted in 1952 was a reasonable method of compensating its employees and that Callan's compensation under that plan was reasonable in light of his significant service to the company. We hold for petitioner. Contingent compensation plans have long been recognized as a permissible method of compensating employees. Mayson Mfg. Co. v. Commissioner,178 F.2d 115, 120 (6th Cir. 1949), remg. a Memorandum Opinion of this Court; Lewisville Instrument Co.,56 T.C. 770, 782 (1971); sec. 1.162-7(b)(2) *391 and (3), [2]/ Income Tax Regs. The principal parameter imposed by respondent's regulation on such plans is that the allowance under the plan be reasonable in amount. Sec. 1.162-7(b)(3), Income Tax Regs. Reasonableness, in turn, is a purely factual question which depends on each individual case. Mayson Mfg. Co. v. Commissioner,supra at 119; Roth Office Equipment Co. v. Gallagher,172 F.2d 452, 455 (6th Cir. 1949). In situations where the recipient of the salary is a shareholder-employee of the corporate taxpayer and can exert influence over the decision making process of that company, a contingent plan invites close scrutiny. Dielectric Materials Co.,supra;Anthony Mennuto,56 T.C. 910, 921 (1971). *392 A careful analysis of all the facts in this case convinces us that the compensation received by Callan for 1969 and 1970 was reasonable in amount. In reaching this conclusion, we are mindful that, at the inception of Central's bonus compensation plan in 1952, Callan and his family owned almost all of Central's stock. Therefore, one could hardly say that the percentage of the company's profits to which Callan became entitled under the plan was determined through arm's-length bargaining. However, nothing in the record indicates that Callan used his majority ownership status in Central to obtain an excessive or otherwise unreasonable level of compensation. To the contrary, Callan's participation in Central's bonus plan has consistently been commensurate with the compensation paid Central's other executives and supervisory personnel. From 1953 until the present, Callan's compensation has consisted of the relatively low salary of $15,000 plus a percentage share of Central's profits. In 1958, Callan's percentage profit share was lowered from 5 percent to 3 percent of Central's profits and has subsequently remained at that level. Callan's compensation thus has been related directly to *393 Central's operational success. It is true that Callan has benefitted from Central's profitable operations, but the same can be said of the other 22 participating employees. In effect, Callan shared the same risks as the other employees covered by the bonus plan. We think Callan's services in 1969 and 1970, detailed in our Findings, justified his salary and bonuses. While he was not primarily involved in the logistical aspects of moving freight during those years, important managerial decisions were either initiated or approved by him. All labor and major personnel policies were subject to his supervision, and all labor union negotiations were personally controlled by him. Central's rate and revenue policies as well as its monthly financial conditions were regularly reviewed by Callan, and he made significant contributions in the hearings before the Texas Railroad Commission on rate increases. During 1969 and 1970, Callan was primarily responsible for Central's expansion of service into the East Texas area. Callan personally negotiated with several freight lines for the purchase of certificates of public convenience in the East Texas area, and was Central's primary witness before *394 the Texas Railroad Commission in hearings concerned with freight line expansion into East Texas. In short, Callan was the architect of Central's expansion into East Texas, a move which has resulted in millions of dollars in capital investment in that area and commensurate increases in operating revenues. Callan's significant ranching operations have never interfered with his function as Central's chief policy maker. Callan's ranching activities were always subordinated to any need of Central for his judgment or active participation in solving management problems. When he left the country on ranching business, he continued his usual review of Central's operational reports. At all times during his absence from the country, Callan made himself available for consultation should any major problems arise in Central's operations. Apparently, respondent's position is that in order to qualify as a chief executive officer, Callan had to be actively involved in all phases of Central's business, including the day-to-day logistical operations of moving freight. However, we think Callan's activities, described above, reasonably justified the compensation he received. Respondent offered testimony *395 comparing Central's compensation levels with those of certain other motor freight carriers. We have given little weight to that testimony as we are not convinced that those companies were sufficiently comparable to Central in terms of their management structure or operations to permit a conclusion that Callan's compensation was excessive. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. /↩ All section references are to the Internal Revenue Code of 1954, as in effect during the years in issue, unless otherwise noted.
2. /Sec. 1.162-7(b), Income Tax Regs., is as follows: (b) The test set forth in paragraph (a) of this section and its practical application may be further stated and illustrated as follows: * * *
(2) The form or method of fixing compensation is not decisive as to deductibility. While any form of contingent compensation invites scrutiny as a possible distribution of earnings of the enterprise, it does not follow that payments on a contingent basis are to be treated fundamentally on any basis different from that applying to compensation at a flat rate. Generally speaking, if contingent compensation is paid pursuant to a free bargain between the employer and the individual made before the services are rendered, not influenced by any consideration on the part of the employer other than that of securing on fair and advantageous terms the services of the individual, it should be allowed as a deduction even though in the actual working out of the contract it may prove to be greater than the amount which would ordinarily be paid. (3) In any event the allowance for the compensation paid may not exceed what is reasonable under all the circumstances. It is, in general, just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances. The circumstances to be taken into consideration are those existing at the date when the contract for services was made, not those existing at the date when the contract is questioned. * * *↩